T.C. Memo. 2002-148


UNITED STATES TAX COURT


STEVEN K. HAN, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 14649-94.                    Filed June 12, 2002.


Richard L. Manning and Ira M. Burman, for petitioner.

Marjory A. Gilbert and Catherine M. Thayer, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, Judge:  Respondent determined a deficiency in, and additions to, petitioner's Federal income tax for 1988 as follows:

|  | Additions to tax | | |
| Deficiency | Sec. 6651(a) | Sec. 6653(a)(1) | Sec. 6661 |
| $31,101 | $7,697 | $1,766 | $7,775 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

In an amendment to petition, petitioner alleged that the income reported on his 1988 return should be reduced by $27,992 because he erroneously reported interest income that was earned on funds that belonged to his wholly owned corporation, N.A. Tours, Inc. In an amendment to answer to amendment to petition, respondent asserted that an increased deficiency for 1988 arose from (1) unreported income from theft of $986,856, dividend income of $20,641, capital gains from real estate sales of $107,021, and ordinary income from those sales of $2,638; and (2) a change in petitioner's filing status from single to married filing separately. Respondent further asserted that the additions to tax determined in the notice of deficiency under sections 6651(a), 6653(a)(1), and 6661 for 1988 should apply to the increased deficiency.

After concessions,[1] the issues remaining for decision are:

(1) Whether petitioner had unreported income of $986,856 from funds diverted from his wholly owned corporations;

(2) whether petitioner had unreported income of $12,913 from dividends earned from brokerage accounts held in his name;

(3) whether petitioner had unreported income of $20,641 from dividends earned from brokerage accounts held in the names of petitioner's nominees;

(4) whether petitioner had income of $27,992 from interest earned on funds diverted from his wholly owned corporations;

(5) whether petitioner is entitled to depreciation deductions of $9,963 claimed on his return;

(6) whether petitioner had unreported rental income of $43,123 from two corporations owned by him;

(7) whether petitioner is subject to an addition to tax under section 6653(a)(1) for negligence; and

(8) whether petitioner is subject to an addition to tax under section 6661 for substantially understating his income tax.

---

[1] In addition to issues settled in a stipulation of settled issues filed in this case, petitioner conceded on brief that he is not entitled to a rental expense deduction of $19,410 or to an investment interest expense deduction of $4,271 claimed on his 1988 return. He also conceded that he is liable for an addition to tax under sec. 6651(a)(1) for failure to timely file his return.

FINDINGS OF FACT

Some facts have been stipulated and are so found.  The stipulation of facts, first supplemental stipulation of facts, second supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference.  Petitioner resided in Lincolnwood, Illinois, when he filed the petition in this case.

Petitioner's Retail Travel and Consolidator Activities

In 1981, petitioner, who also is known as Kee Soo Han, incorporated Air America Travel Services, Inc. (Air America), an Illinois corporation, the principal place of business of which was in Chicago, Illinois.  At all times, petitioner was Air America's sole shareholder.  Air America sold airline tickets to the general public as a retail travel agent.  During 1984, Air America also started doing business as a consolidator[2] for Northwest Airlines, Inc. (Northwest).[3]  Air America's consolidator activities primarily involved selling airline

---

[2] A consolidator is a third-party seller of airline tickets written on blank tickets imprinted with the airline carrier's name, called ticket stock, issued by an airline carrier.  The consolidator sells the ticket stock wholesale to retail travel agents, called subagents, at a price lower than the price at which retail travel agencies usually sell airline tickets to the general public.

[3] For some of the relevant period, Northwest Airlines, Inc., operated under the name "Northwest Orient Airlines".

tickets in Korean ethnic communities in the United States for flights between the United States and Korea.

Beginning in 1984, petitioner incorporated six wholly owned corporations, operating in different localities under the "NA Tours" name, to conduct his consolidator business (hereinafter in the aggregate referred to as the NA Tours companies). In August 1984, petitioner incorporated K-P Travel, Inc. (K-P Travel), an Illinois corporation. In June 1986, petitioner changed K-P Travel's name to N.A. Tours, Inc. (IL NA Tours). Its principal place of business was Chicago, Illinois. In March 1986, petitioner incorporated NA Tours of California, Inc. (CA NA Tours), a California corporation, whose principal place of business was Los Angeles, California. In June 1986, petitioner incorporated NA Tour of New York, Inc. (NY NA Tours), a New York corporation, whose principal place of business was New York, New York. In September 1986, petitioner incorporated NA Tours of San Francisco, Inc. (SF NA Tours), a California corporation, whose principal place of business was San Francisco, California. At some time, petitioner also incorporated NA Tours of Washington, D.C., whose principal place of business was Washington, D.C., and NA Tours of Seattle, Washington, whose principal place of business was Seattle, Washington. From 1986 until the end of 1988, Air America did not operate as a consolidator, but during

that period it continued to operate as a retail travel agent. Air America returned to doing consolidator business at the end of 1988. Hereinafter, we will refer to Air America and the NA Tours companies collectively as petitioner's or his corporations.

By 1987, petitioner's corporations were generating approximately $50 million in annual gross receipts from their operations as consolidators for Northwest and had between 70 and 80 employees. During 1987, petitioner hired David Chung (Chung) to serve as accountant for his corporations. Sometime later, petitioner promoted Chung to controller and vice president of IL NA Tours. Among other things, Chung was responsible for preparing financial statements for the NA Tours companies.

Petitioner continued to be the sole shareholder and president of Air America and each of the NA Tours companies throughout 1988. When he incorporated each NA Tours company, petitioner did not contribute any money or property to the capital of the corporation. None of the NA Tours companies ever declared a dividend. IL NA Tours used the other NA Tours companies, Air America, and unaffiliated subagents as its subagents to distribute airline tickets.

The NA Tours companies continued to operate as consolidators for Northwest into 1988. In 1988 IL NA Tours also operated as a

consolidator for Korean Airlines, and the NA Tours companies sold retail airline tickets.

Northwest did not require its consolidators to pay for ticket stock at the time of transfer to the consolidator or upon the transfer of that ticket stock to the consolidator's subagents. Rather, payment was not due, and a consolidator could retain the proceeds of a sale of Northwest ticket stock, until the submission of an "auditor's coupon" to Northwest. (An auditor's coupon was one copy of the multiple-copy ticket that served as a permanent record of a ticket sold.) Before 1987, auditor's coupons did not have to be submitted to Northwest until 45 days after each 2-week sales period, when coupons for all tickets sold during the sales period were due, together with payment for the tickets less the consolidator's commission. Sometime in 1987, Northwest modified its procedures to reduce the period during which proceeds from the sale of ticket stock could be retained by a consolidator. Under the new procedures, consolidators were required to submit auditor's coupons for tickets sold on a weekly basis; Northwest then prepared a sales report based on the submitted coupons and invoiced the consolidator, with payment due within 7 days of receipt of the invoice.

As a consequence of Northwest's procedures for collecting payment for ticket stock from its consolidators, petitioner's corporations were able to postpone payment for ticket stock for significant periods. In addition, before 1987, IL NA Tours was frequently late in remitting payment to Northwest; after the initiation of the more expedited procedures in 1987, IL NA Tours' payment delays intensified.

During the periods that petitioner's corporations held ticket sales proceeds, petitioner would invest them in the stock market. Petitioner enjoyed speculating in the stock market, frequently purchasing heavily margined[4] stock. Petitioner used various brokerage accounts for purposes of investing his corporations' funds, including ticket sales proceeds, in the stock market.

During 1987, petitioner opened the following three brokerage accounts, among others: (1) Account No. 682-07658 at Merrill

---

[4] "Margin" is a method of buying securities on credit extended by the brokerage firm handling the purchases. The securities are used as collateral for the loan. The brokerage firm establishes a margin account for the customer. The initial amount of funds in the margin account (initial margin) is regulated by the Federal Reserve Board. In addition, the brokerage firm specifies the minimum amount (maintenance margin) below which the balance in the margin account may not fall before the brokerage firm will request that either more cash or securities be added to the margin account or the securities be sold (margin call). Modern Dictionary For the Legal Profession 517 (1993).

Lynch Pierce Fenner & Smith, Inc. (Merrill Lynch[5]) (Merrill Lynch No. 1), which was opened in the name of Air America and under Air America's taxpayer identification number (TIN) but considered to be IL NA Tours' account; (2) account No. 879 07787 at Merrill Lynch (Merrill Lynch No. 2), which was opened in the name of NY NA Tours and under NY NA Tours' TIN but considered to be IL NA Tours' account; and (3) account No. A19 52547 at E.F. Hutton & Co., Inc. (Merrill Lynch No. 3), which was opened in the name of IL NA Tours and under Air America's TIN and considered to be IL NA Tours' account. Hereinafter, we refer to those three accounts collectively as the corporate accounts.

Transfers Out Of Corporate Accounts in 1987[6]

In June 1987 petitioner opened a brokerage account, account No. 78-36391001 (Allied account), at Allied Capital Group under his name and Social Security number, but with the designation "d/b/a Tours of Illinois". Notwithstanding this designation, the

---

[5] The brokerage firm's name changed during the periods relevant to the instant case, and, at some time, it acquired the brokerage firm E.F. Hutton & Co. For simplicity, hereinafter we use the term "Merrill Lynch" to refer to the brokerage firm Merrill Lynch Pierce Fenner & Smith regardless of the name it used on a specific date.

[6] The transfers of cash and assets from corporate accounts to petitioner's personal accounts or accounts under his personal control that are discussed in this section are not included in the amounts that respondent alleges are includible in petitioner's income in 1988.

account was petitioner's personal account, the securities transactions from which were reported on his individual tax returns. On August 7 and October 7, 1987, petitioner transferred $59,582 and $18,257, respectively, from IL NA Tours to the Allied account.

In August 1987, petitioner transferred $109,777 of IL NA Tours' funds to account No. 879 62934 (Chung No. 2) at Merrill Lynch, an account which petitioner had opened at some time in Chung's name and under Chung's Social Security number. Chung, however, was a nominee only as he had no ownership interest in Chung No. 2 and received no benefit from the account. Petitioner closed Chung No. 2 on April 6, 1988, and transferred the assets in the account at its closing to account No. 03T 115428 (Chung No. 4) at Prudential-Bache Securities (Prudential-Bache[7]), which he had opened in Chung's name on or before April 6, 1988. Chung No. 4 was funded with stock and money that came directly or indirectly from IL NA Tours.

Between January 1 and October 18, 1987, an additional $259,027 of IL NA Tours' corporate funds was transferred to petitioner's personal control, as follows:

_____

[7] Prudential-Bache Securities at some time became known as Prudential Securities, Inc. For simplicity, we will refer to the brokerage firm throughout the opinion as Prudential-Bache, regardless of it precise name at any particular time.

| Description | Amount |
|---|---|
| Interbank transfers to bank accounts in petitioner's individual name | $59,500 |
| Checks payable to petitioner | 32,359 |
| Checks payable to cash, endorsed by petitioner | 48,100 |
| Checks payable to gambling casinos | 52,000 |
| Check for mortgage payment for property at 4730 N. Hermitage Avenue, Chicago[1] | 16,000 |
| Check payable to brokerage account in name of On Sug Youn[2] | 34,000 |
| Check payable to brokerage account in names of On Sug Youn and Si Joung Youn | 17,068 |
| Total | 259,027 |

[1] This real property was purchased by petitioner in 1977, and when it was sold in 1988, the proceeds were equally divided between petitioner and his former spouse.

[2] Other than the fact that she was not an employee of petitioner or petitioner's corporations, the record does not disclose On Sug Youn's relationship to petitioner. However, the record does disclose that, in addition to the accounts noted above, a joint brokerage account with right of survivorship was established by petitioner under his name and that of On Sug Youn.

During 1987, one of the corporate accounts, Merrill Lynch No. 1, held stock in the Gerber Products Co. (Gerber stock). On October 13, 1987, petitioner transferred the Gerber stock to account No. 682 35487 at Merrill Lynch (Chung No. 1), which petitioner had opened sometime during 1987 in Chung's name and under Chung's Social Security number. Chung, however, served as a nominee only for Chung No. 1. He had no ownership interest in that account and received no benefit from it. Petitioner controlled and directed all activities with respect to Chung No.

1, and it belonged to him personally. Petitioner transferred the Gerber stock to hide it from a margin call.

While in Chung No. 1, the Gerber stock was sold on December 24, 1987, for $335,563. Assets purchased with the Gerber stock proceeds were transferred from Chung No. 1 on February 16 and 24, 1988, to another account that petitioner had directed Chung to open at Prudential-Bache, account No. ATY 065408 (Chung No. 3[8]). Assets in Chung No. 3 were transferred to an account in petitioner's name, account No. ATY 066749 at Prudential-Bache (P-B No. 2) on March 9, 1988. Petitioner was actively buying and selling securities in P-B No. 2 during March through May 1988. The net balance in P-B No. 2 as of March 31, 1988, was $273,855. The net balance as of April 30, 1988, was $305,642. During 1988, petitioner also used funds in P-B No. 2 to pay personal VISA charges totaling $1,535. On May 26, 1988, $271,836, which petitioner's attorney represented to be the Gerber stock proceeds, was transferred from P-B No. 2 to a client trust account established by petitioner's attorney in connection with a proposal by petitioner to secure a release from all personal

---

[8] As with the other Chung accounts, although Chung No. 3 was opened under Chung's name and Social Security number, Chung did not have an ownership interest therein but instead served only as petitioner's nominee. Petitioner owned Chung No. 3 personally.

liability to Northwest. The net balance in P-B No. 2 as of May 31, 1988, was zero. (See infra pp. 25-26.)

1987 Stock Market Crash

During October 1987, many stocks listed on the stock market began to decline in value. Then, on October 19, 1987, the stock market declined dramatically (stock market crash) resulting in substantial decreases in value for many stocks. Petitioner had purchased many of the stocks in the corporate accounts on margin, and he was called upon to furnish additional margin. When he was unable to meet the margin calls, the stocks were sold at a loss. On its 1987 corporate return, IL NA Tours reported net losses of $6,472,649, some of which resulted from losses incurred by the corporate accounts following the stock market crash.

Northwest Ticket Recall Program

The tickets that consolidators wrote on Northwest ticket stock were not easily distinguishable from ticket stock originating from other sources. In 1987, Northwest decided to redesign the ticket stock in order for consolidator tickets to be more easily distinguishable. Consequently, in December 1987 Northwest began a recall of all old ticket stock (ticket recall program). Under the terms of the ticket recall program, a consolidator would not be issued new ticket stock until the consolidator accounted for all old ticket stock. The ticket

recall program would disclose any ticket stock that a consolidator had sold but not yet reported to Northwest, because a consolidator had to return either its old ticket stock or payment for that stock by a specified date.

In December 1987, petitioner received notice of the ticket recall program. He realized the ticket recall program would require him to account to Northwest for all amounts his corporations owed for ticket stock Northwest had previously issued to them. Additionally, petitioner realized that neither he nor his corporations had sufficient funds to pay Northwest what his corporations owed it for previously issued ticket stock. Petitioner feared that Northwest would seize his corporations' assets as payment toward the debt they owed Northwest.

Transfers Out Of Corporate Accounts Into Petitioner's Personal Accounts in 1988

After learning of the ticket recall program, petitioner in early 1988 transferred approximately $1.3 million from IL NA Tours corporate funds into a personal brokerage account to purchase stock held in that account. IL NA Tours maintained a money market account, account No. 8-20911 (Albank No. 1), at Albany Park Bank and Trust (Albank[9]). Between January 7 and

---

[9] Albany Park Bank & Trust operated under various names throughout the years. For consistency, we will use the name "Albank" to refer to that financial institution regardless of its
(continued...)

February 2, 1988, petitioner transferred $1,294,058 from IL NA
Tours' Albank No. 1 account into his personal brokerage account
at First Chicago Investment Services, account No. 518-069943
(FCIS account), to fund various purchases of stock for the FCIS
account.  The specific transfers and the stock purchases to which
they were applied were:

| Date | Amount | Shares Purchased |
|------|--------|------------------|
| Jan. 7 | $107,250.00 | 25,000 Navistar Intl. |
| Jan. 20 | 248,277.50 | 10,000 Marion Labs |
| Jan. 21 | 19,368.69 | 2,850 Fed. Natl. Mtg. |
| Jan. 22 | 6,706.38 | 1,000 Fed. Natl. Mtg. |
| Jan. 22 | 42,322.75 | 6,350 Fed. Natl. Mtg. |
| Jan. 22 | 116,600.00 | 40,000 Pan Am |
| Feb. 1 | 448,877.50 | 10,000 Kodak |
| Feb. 1 | 51,362.79 | 5,000 Lorimar Telepi |
| Feb. 2 | 253,292.50 | 10,000 Intel |
| Total | 1,294,058.11 | |

Between January 28 and February 22, 1988, petitioner sold
all of the stock in the FCIS account that had been purchased with
funds from the Albank No. 1 account, except for the 10,000 shares
of Eastman Kodak Co. (Kodak stock) and the 40,000 shares of Pan
Am Corp. (Pan Am stock), and transferred the resulting proceeds
back to the Albank No. 1 account, in the following amounts:

---

[9](...continued)
exact name at any particular time.

| Date | Amount | Shares Sold |
|------|--------|-------------|
| Jan. 28 | $79,914.32 | 10,200 Fed. Natl. Mtg. |
| Feb. 1 | 195,071.36 | 7,600 Marion Labs |
| Feb. 9 | 60,979.35 | 2,400 Marion Labs |
| Feb. 12 | 54,798.16 | 5,000 Lorimar Telepi |
| Feb. 18 | 256,692.50 | 10,000 Intel |
| Feb. 22 | 105,246.38 | 25,000 Navistar Intl. |
| Total | 752,702.07 | |

On April 4, 1988, petitioner transferred a $4,500 dividend paid on the Kodak stock in the FCIS account from that account back to Albank No. 1. On his 1988 return, petitioner reported the gains and losses on all of the foregoing sales except with respect to the Federal National Mortgage Association (Fed. Natl. Mtg.) stock.

As noted, the Kodak stock and Pan Am stock were not liquidated and transferred back to Albank No. 1; instead, each was subsequently transferred from petitioner's FCIS account to other personal accounts of petitioner's.

The Kodak stock was transferred from petitioner's FCIS account on March 4, 1988 (3 days after Northwest began an audit of petitioner's corporations' consolidator activities, see infra p. 22), to account No. 03T 112101 at Prudential-Bache (P-B No. 1), another personal account. The Pan Am stock remained in the FCIS account until April 11, 1988, when it was transferred to P-B No. 2, another personal account. Petitioner's FCIS account was then closed.

Petitioner again transferred the Kodak stock on March 17, 1988 (1 day before signing a personal guaranty of his corporations' outstanding debts to Northwest, see <u>infra</u> p. 23), from his personal P-B No. 1 account to account No. 03T 110949 at Prudential-Bache, which he had opened in January 1988 under the name and Social Security number of his brother, Sam Han[10] (Sam Han account). Subsequently, on June 20, 1988, 3 days after learning that Northwest would file suit against him, see <u>infra</u> pp. 26-27, petitioner transferred the Kodak stock back to P-B No. 1. Petitioner sold the Kodak stock on June 21, 1988, for $445,596. On June 24, this amount was transferred to a client trust account pursuant to the terms of a temporary restraining order obtained by Northwest against petitioner the previous day. See <u>infra</u> pp. 28-31.

On his 1988 return, petitioner claimed a loss of $3,280 relating to the sale of the Kodak stock; IL NA Tours did not claim such a loss on its own return. Dividends totaling $4,500 were declared on the Kodak stock while it was held in petitioner's FCIS account. As previously noted, those dividends were deposited into the FCIS account on April 4, 1988. On the same day, petitioner returned $4,500 to IL NA Tours' Albank No. 1

---

[10] Sam Han, also known as Seung Soo Han, was not an employee of any of petitioner's corporations during 1988.

account. Neither petitioner nor IL NA Tours reported this dividend income on their 1988 returns.

Petitioner's P-B No. 2 account, into which the Pan Am stock was transferred on April 11, 1988, had had a net balance of $273,855 on March 31, 1988. The Pan Am stock in P-B No. 2 was sold in two portions in April and May 1988. Petitioner sold 30,000 shares on April 22, 1988, for a net of $77,246 and the remaining 10,000 shares on May 20, 1988, for a net of $26,897.[11] Numerous other transactions occurred in P-B No. 2 during March through May 1988. The net balances in P-B No. 2 were $305,642 and zero as of April 30 and May 31, 1988, respectively.

January 1988 Agreement With Northwest Regarding Back Debt

In furtherance of its ticket recall program, Northwest advised petitioner on January 21, 1988, that as of that date its records indicated that the NA Tours companies owed Northwest a net of $3,231,921 (back debt), and it requested that petitioner, individually and as president of IL NA Tours, enter into a letter agreement with Northwest (January agreement) providing for periodic payment of the back debt. At that time, Northwest's ticket recall program was not complete. Petitioner agreed to Northwest's proposal. When he signed the January agreement on

---

[11] Thus, Pan Am stock purchased for $116,600 was sold for a total of $104,143. Neither petitioner nor IL NA Tours reported any loss from the sale of the Pan Am stock on their 1988 returns.

January 21, 1988, petitioner knew that IL NA Tours owed Northwest significantly more than the amount set forth in the January agreement.

Under the January agreement, petitioner, as president and owner of IL NA Tours, agreed to pay Northwest $62,155 per week toward the back debt. Those payments were to be in addition to any current amount petitioner's corporations owed Northwest for ticket sales, in order for them to be current by the end of 1988.

IL NA Tours made at least seven payments of $62,155 each between February 2 and March 18, 1988.[12] Neither petitioner nor any NA Tours company made any payments to Northwest under the January agreement after March 18, 1988.

Transfers Out of Corporate Accounts Into the Sam Han Account in 1988

On January 19 and 20, 1988, immediately before executing the January agreement, petitioner withdrew $100,000 and $200,000, respectively, from IL NA Tours' Albank No. 1 account and placed

---

[12] We cannot determine from the record the source from which IL NA Tours obtained the funds to make these payments to Northwest. Petitioner contends on brief that the funds he returned from his FCIS account to IL NA Tours' Albank No. 1 account were used to meet the corporation's obligations to Northwest. The record, however, does not show that the funds returned to Albank No. 1 from the FCIS account were used to make those payments to Northwest. Statements in briefs are not evidence, and they cannot be used as such to supplement the record. See, e.g., Rule 143(b); Niedringhaus v. Commissioner, 99 T.C. 202, 214 n.7 (1992).

those amounts into the Sam Han account. Petitioner owned and controlled the Sam Han account; Sam Han had no ownership interest in it. Sometime in 1988 before March 8, petitioner placed $70,000 of IL NA Tours' funds into Albank No. 3, one of his personal accounts. On March 8, 1988, petitioner withdrew $70,000 from Albank No. 3 and placed it into the Sam Han account. On March 9, 1988, petitioner withdrew $80,000 from a bank account maintained by SF NA Tours and placed it into the Sam Han account. The $80,000 had been transferred in 1987 to the SF NA Tours account from IL NA Tours' funds. Thus, between late January and early March 1988, cash from IL NA Tours' accounts totaling $450,000 was transferred into the Sam Han account.[13]

Other Transfers From Corporate Accounts to Personal Use in 1988

From January 1 through April 3, 1988, petitioner withdrew $28,000 in cash from IL NA Tours' Albank No. 1 account for his personal use.

On January 29, 1988, petitioner took $9,662 from account No. 1-26373 (Albank No. 2), maintained at Albank in the name of IL NA Tours, and placed it into the Allied account (a personal brokerage account of petitioner's).

---

[13] During 1988, in addition to the Sam Han account, petitioner maintained four other brokerage accounts in Sam Han's name into which petitioner placed corporate funds. The record does not provide information as to the disposition of the assets in those accounts, and they are not in issue in the instant case.

On February 8, 1988, petitioner took $22,000 from account No. 4-35325 (Albank No. 3) maintained at Albank in his own name, and put it into his Allied account. On February 16, 1988, petitioner transferred $22,000 from IL NA Tours' Albank No. 1 account to his Albank No. 3 account to cover an overdraft in the latter caused by the February 8, 1988, transaction.

Also during 1988, petitioner used corporate funds to pay the following personal expenses, loans, or gifts:

| Item | Amount |
|------|--------|
| Car insurance premiums | $3,945 |
| Car repairs | 3,250 |
| Real estate insurance premiums | 3,168 |
| Real estate taxes | 442 |
| American Express charges | 4,964 |
| Life insurance | 213 |
| Utilities | 506 |
| Beverly A. Seman | 1,000 |
| Florist bills | 305 |
| Attorney's fees | 8,233 |
| Total | 26,026 |

Petitioner did not include the corporate payments of personal expenditures in income on his 1988 return.

Thus, in addition to the corporate funds used to purchase the Pan Am and Kodak stock and the $450,000 in transfers of corporate funds to the Sam Han account, petitioner transferred

into personal accounts, or took for personal use, additional corporate funds totaling $85,688 in 1988.[14]

Petitioner reported no dividend income on his 1988 return from any of his corporations, and the total reported as wages or salary was $37,500.

Northwest Audit

Northwest commenced an audit of petitioner's corporations' consolidator activities on March 1, 1988.  Petitioner retained an attorney, Sheldon Belofsky (Belofsky), to represent him and his corporations in the matter of Northwest's audit of their consolidator activities.

Northwest's audit of petitioner's corporations' consolidator activities revealed large "round number" withdrawals from corporate accounts going into various brokerage firm accounts. The brokerage account statements were not kept at petitioner's corporations' offices, and Northwest had trouble obtaining copies of the statements from petitioner or from the brokerage firms.

During the course of Northwest's audit of petitioner's corporations' consolidator activities, petitioner refused to give Northwest records of receipts from ticket sales to subagents. Petitioner also refused to give Northwest's auditors personal

---

[14] This $85,688 does not form any part of the $986,856 in funds at issue in this case that respondent asserts is taxable income of petitioner in 1988.

- 23 -

financial information.  Joseph J. Hasman (Hasman), an attorney representing Northwest, came to believe that petitioner's failure to provide the records was deliberate.

In attempting to trace funds, Northwest concluded that petitioner had opened more than 20 different brokerage accounts in the names of various individuals into which he placed corporate funds during 1987 and 1988.

Petitioner's Guaranty of Corporate Indebtedness to Northwest

By March 18, 1988, Northwest officials knew that petitioner's corporations' debt to Northwest far exceeded the $3,231,921 set forth in the January agreement.  Consequently, at Northwest's request, on March 18, 1988, petitioner, individually and on behalf of his corporations, executed a written personal guaranty (Guaranty).  Under the Guaranty, petitioner personally guaranteed the prompt payment to Northwest at maturity of all the past and future monetary obligations of petitioner's corporations which arose out of ticket sales.

One day before signing the Guaranty, petitioner transferred the contents of P-B No. 1, an account in his name, to the Sam Han account, registered in his brother's name.  This transfer included the Kodak stock at issue in this case, as well as stocks valued at $582,356 and debit memos of $573,610 not at issue in this case.  In addition, as noted previously, on March 8, 1988,

petitioner had taken $70,000 from an account in his name (Albank No. 3) (which amount he had taken earlier in the year from IL NA Tours) and placed it into the Sam Han account. Also, on March 9, petitioner had taken $80,000 from a corporate account of SF NA Tours and placed it into the Sam Han account.

Belofsky was not made aware of the Guaranty or its terms before petitioner signed it. After learning of the Guaranty, Belofsky on March 28 protested its execution and validity to Hasman, arguing that petitioner had signed the Guaranty without benefit of counsel and without consideration, and therefore that it should be returned to petitioner.

Interim Agreement

On April 7, 1988, petitioner entered into an interim agreement (Interim Agreement) with Northwest, on behalf of himself, IL NA Tours, NY NA Tours, and Air America. In the Interim Agreement, Northwest agreed to give petitioner's corporations 1,000 tickets of Northwest ticket stock subject to prepayment requirements and strict accounting rules, which included petitioner's agreement to pay Northwest $500,000 as a partial prepayment for the ticket stock. Petitioner admitted in the Interim Agreement that petitioner's corporations had received proceeds from the sale of Northwest ticket stock to subagents which had not been forwarded to Northwest. Petitioner further

admitted that, while the total amount not forwarded was unknown, petitioner's corporations had not forwarded and now owed Northwest an amount in excess of $8 million.

In addition, in the Interim Agreement petitioner personally guaranteed the debts of petitioner's corporations arising from the sale of Northwest tickets received in 1988 (but not before) and agreed to pledge any unencumbered assets of petitioner's corporations to secure future corporate debts to Northwest. Petitioner further agreed to make a full and complete disclosure to Northwest of all personal and corporate financial records, including bank and brokerage accounts.

After the Interim Agreement was signed, Belofsky continued to challenge the validity of the Guaranty and to request its return. Belofsky also asserted that the Guaranty did not form any basis for the Interim Agreement.

Petitioner's Proposal for Release of His Liabilities Under the Guaranty and the Interim Agreement

On May 20, 1988, Belofsky wrote a letter to Northwest seeking a return of petitioner's Guaranty and his release from liability under the Interim Agreement. As consideration for the release and the return of the Guaranty, Belofsky proposed that petitioner would liquidate the "'Gerber' account" and give the proceeds to Northwest to be applied first against the amounts petitioner's corporations owed Northwest for ticket stock issued

to those corporations after January 1, 1988, and then to the amounts owed for ticket stock issued before that date.  Belofsky further advised Northwest that he would have petitioner deposit with Belofsky the proceeds of the "'Gerber' account", which he would then hold until he received appropriate documentation from Northwest.

At the time this letter was written, the Gerber stock proceeds, as well as numerous other assets, including the Pan Am stock, had been transferred to one of petitioner's personal accounts, P.B. No. 2.[15]  On May 26, 1988, petitioner transferred $271,836 in cash from P-B No. 2 to account No. 14196956 (ANB No. 2), a client trust account with American National Bank (American National), which Belofsky had established for petitioner.

Northwest did not accept Belofsky's proposal.

Northwest's Litigation Against Petitioner and His Corporations

On June 16, 1988, Northwest advised Belofsky that Northwest's analysis of petitioner's corporations' consolidator activities showed that petitioner and his corporations owed

---

[15] As previously noted, the Gerber stock was transferred by petitioner from one of the corporate accounts (Merrill Lynch No. 1) to petitioner's personal account, Chung No. 1, on Oct. 13, 1987.  The stock was sold for $335,563 on Dec. 24, 1987, and the proceeds were held in Chung No. 1 until Feb. 24, 1988, when all assets in that account were transferred to another personal account of petitioner's, Chung No. 3.  On Mar. 9, 1988, petitioner transferred the assets in Chung No. 3 to another personal account, P.B. No. 2.

Northwest $14,947,176, computed on the basis of auditor's coupons after giving credit for commissions earned.  The following day Hasman informed Belofsky that Northwest intended to file suit against petitioner and petitioner's corporations because, Northwest maintained, petitioner had refused to cooperate or comply with the Interim Agreement.  Thereafter, on June 20, 1988, Northwest filed a multicount complaint against petitioner individually and against petitioner's corporations for, among other things, specific performance of the Interim Agreement, breach of oral contract, express guaranty, fraudulent conversion, unjust enrichment, imposition of a constructive trust, and injunctive relief (Northwest litigation).[16]  In its complaint, Northwest further alleged that petitioner had failed to comply with the Interim Agreement by, inter alia, refusing to disclose all of the bank and brokerage account records of petitioner and his corporations.  Throughout the Northwest litigation, Belofsky represented both petitioner and his corporations.

Northwest decided to sue petitioner individually and to include a fraudulent conversion count against him because Northwest's audit had revealed that substantial amounts of the

---

[16] Petitioner, IL NA Tours, and Air America filed answers in the Northwest litigation, but NY NA Tours, CA NA Tours, and SF NA Tours did not.  A default judgment was subsequently entered against the latter three corporations.

money petitioner's corporations owed Northwest had been transferred from corporate accounts into individual accounts in petitioner's name or the names of relatives or employees. Throughout the Northwest litigation, petitioner denied any personal liability to Northwest.

Northwest claimed damages in excess of $17.9 million in its complaint,[17] alleging that petitioner and his corporations had fraudulently converted, and/or were unjustly enriched by, at least $14.9 million. Northwest included one count in its complaint against petitioner alone, based upon the Guaranty. From the initiation of the Northwest litigation until its settlement, petitioner and his corporations conceded that his corporations, but not petitioner individually, were liable to Northwest for ticket sales proceeds that had not been remitted. Petitioner and his corporations also did not agree with Northwest's calculation of the amount owed Northwest, claiming that petitioner's corporations owed Northwest just under $9 million.

On June 23, 1988, Northwest sought a temporary restraining order (TRO) in an attempt to (i) prevent petitioner and his

---

[17] The $17.9 million included net sales proceeds of $14.9 million that Northwest alleged it was owed for ticket stock sold by petitioner's corporations plus an estimated net value of $3 million for 4,800 tickets for which petitioner and his corporations had not accounted to Northwest.

corporations from misappropriating, dissipating, or losing ticket sales proceeds or assets in which the proceeds might have been invested, as well as blank, unsold ticket stock, and (ii) require petitioner and his corporations to disclose bank and brokerage account information.  Northwest was granted the TRO that same day.  The TRO, among other things, restrained petitioner and his corporations from transferring, encumbering, investing, dissipating, using, or otherwise disposing of proceeds from Northwest tickets sold before April 8, 1988 (or any assets in which the proceeds might have been invested), except to deposit the proceeds in an account over which Northwest had signatory authority and control or otherwise upon Northwest's or the court's authorization.  The TRO further ordered petitioner and his corporations to make a full disclosure of all books, records, and documents pertaining to the sale of tickets and the proceeds thereof, including bank and brokerage account statements. Finally, the TRO prohibited petitioner and his corporations from distributing, transferring, or otherwise disposing of any blank, unsold Northwest tickets delivered to them on or before the date of the Interim Agreement.  At the time the TRO was granted, the sale of Northwest tickets constituted approximately 90 percent of petitioner's corporations' business activity.  The TRO was renewed periodically through at least November 22, 1988.

To effect compliance with the TRO, Hasman and Belofsky agreed that Belofsky, as sole trustee, would hold in client trust accounts those funds that Northwest discovered had been diverted from petitioner's corporations' accounts. Consequently, at various times, in addition to ANB No. 2 (which contained the proceeds from the sale of the Gerber stock), see supra pp. 25-26, Belofsky established other client trust accounts at American National to comply with the TRO. Those client trust accounts included account No. 80082106 (ANB No. 1), account No. 14199580 (ANB No. 3), account No. 14199939 (ANB No. 4), account No. 322447700 (ANB No. 5), and account No. 901679 (ANB No. 6) (collectively the ANB accounts).[18] Belofsky used petitioner's Social Security number for the ANB accounts during their existence.[19] Belofsky acted at all times in a custodial capacity with respect to the ANB accounts.

On June 24, 1988, with Hasman's authorization, Belofsky transferred $445,596, representing the proceeds of the sale of

---

[18] The record indicates that other ANB accounts were maintained to which petitioner's or petitioner's corporations' funds may have been deposited directly or indirectly. However, the record does not provide sufficient information relating to those accounts to enable us to make further findings of fact with respect to them. Accordingly, we do not address those accounts.

[19] Petitioner received various backup withholding tax credits with respect to the ANB accounts in his name during 1989, 1990, and 1991.

the Kodak stock, from petitioner's personal P-B No. 1 account into ANB No. 1.

Notwithstanding the granting of the TRO, Northwest remained frustrated in its efforts to obtain information from petitioner regarding bank and brokerage accounts into which ticket sales proceeds had been transferred.  On July 1, 1988, Hasman wrote Belofsky advising him of petitioner's refusal to provide financial documents and Hasman's opinion that such conduct violated the TRO, and urging Belofsky to counsel petitioner on the need to comply with the TRO so as to "resolve the growing need for court supervision of your client's conduct".  More specifically, Hasman wrote:

> I was advised yesterday that our [Northwest's] auditors' review of the sparse documents which Mr. Han and Mr. Chung have made available disclosed six brokerage accounts, about which Northwest had no prior knowledge because of Mr. Han's prior refusal to disclose those accounts, or documentation which would lead to disclosure of those accounts.  This appears to be a pattern that your client has been following, namely, withholding information and documentation which would lead to the disclosure of relevant financial and other information necessary to conduct the ongoing audit.  We believe that the withholding of documentation which would lead to disclosure of accounts in which Mr. Han and his companies have transferred funds has been and continues to be intentional and in violation of the requirement * * * of the TRO, which requires the defendants to allow my client "immediate access" to books, records and documents.

Subsequently, on July 18, 1988, with Hasman's approval, Belofsky deposited a check for $80,000, drawn on the Sam Han account, to ANB No. 3, but Northwest was not made aware of the existence of the Sam Han account at this time.[20] Northwest's auditors uncovered the Sam Han account sometime shortly before September 2, 1988, when Hasman wrote Belofsky demanding an explanation.[21] The Sam Han account was the subject of an amendment to the TRO sought by Northwest and granted on October 14, 1988, which specifically identified and "froze" it. As of

---

[20] In an Aug. 4, 1998, letter to Belofsky, Hasman reiterated complaints about petitioner's recalcitrance in disclosing information:

> Enclosed marked Attachments I through IV is the current list of information and documents requested from Mr. Han quite some time ago, but still not turned over.
>
> Even a cursory review of Attachments I through IV belies your recent statements that we are close to having all of the significant information that we need to complete our audit. When I see unaccounted for wire transfers and withdrawals in the quarter or half million dollar ranges, I cannot help but become very skeptical about the reasons Mr. Han has not been forthcoming with this information.
>
> * * * We are learning of new accounts, other previously undisclosed assets and other information suggesting that there may be "more out there" than Mr. Han has misled us to believe.

[21] Hasman's Sept. 2, 1988, letter states: "We * * * demand prompt written explanation of who Seung Soo Han is. Our ticket money has been traced into Prudential-Bach account ATY-110949 [i.e., the Sam Han account], standing in that person's name".

December 31, 1988, the Sam Han account contained assets with a value of $137,128. The record does not reflect what happened to the remainder ($232,872) of the $450,000 that petitioner had transferred to the Sam Han account between January 19 and March 9, 1988.[22]

Thus, including the so-called Gerber account proceeds transferred in May 1988 from P.B. No. 2[23] to ANB No. 2 (in connection with Belofsky's proposal for gaining petitioner's release from personal liability), by yearend 1988 the following amounts were on deposit in accounts governed by the terms of the TRO:

---

[22] The foregoing analysis of the Sam Han account disregards the transfers of the Kodak stock into and out of that account on Mar. 17 and June 20, 1988, respectively.

[23] By late May 1988, P-B No. 2 contained the proceeds from the sale of the Gerber stock and from the sale of the Pan Am stock, as well as other assets. The Gerber stock proceeds are not included in the amounts that respondent alleges are includible in petitioner's income in 1988, although the Pan Am stock proceeds are.

| Account | Amount | Source |
|---------|--------|--------|
| ANB No. 2 | $271,836 | "Gerber account" proceeds from P-B No. 2 |
| ANB No. 1 | 445,596 | Kodak stock proceeds from P-B No. 1 |
| ANB No. 3 | 80,000 | Sam Han account |
| Sam Han acct. | 137,128 | TRO amended to cover 10/14/88 |
| Total | [1]934,560 | |

[1] An additional client trust account established by Belofsky at American National, account No. 14199939 (ANB No. 4), contained $35,852 transferred thereto on Aug. 15, 1988, from petitioner's Allied account pursuant to Hasman's Aug. 2 authorization. Although the Allied account contained amounts transferred from corporate accounts in 1987 and 1988, these transfers are not included in the amounts that respondent alleges are includible in petitioner's income in 1988.

Northwest's Exercise of Letters of Credit From Petitioner's Corporations

On July 26, 1988, Northwest exercised a letter of credit in the amount of $54,000 from petitioner's corporations. Northwest exercised a second letter of credit in the amount of $50,000 from petitioner's corporations on August 22, 1988. It exercised a third letter of credit in the amount of $146,000 from petitioner's corporations on August 24, 1988.

The foregoing letters of credit were secured by various assets of petitioner's corporations held by Albank as well as real property owned by petitioner personally.

Recordation of ANB Accounts in IL NA Tours' Workpapers

In August 1988, in connection with the preparation of financial statements for IL NA Tours covering the period January 1 through June 30, 1988, Chung prepared workpapers that recorded the balances in the ANB accounts at that time as assets of IL NA Tours. Chung obtained information for this purpose from Belofsky.

Northwest's Conclusions From Its Audit

Northwest's auditors completed the audit of petitioner's corporations' consolidator activities on or about August 31, 1988. Northwest concluded that, as of August 31, 1988, after crediting the letters of credit exercised and the commissions Northwest owed petitioner's corporations, petitioner and his corporations owed Northwest approximately $15,439,468. Petitioner did not agree with Northwest's calculation of the amount owed.

As a result of the audit, Northwest's auditors concluded on the basis of the information then available to Northwest that during 1987 and 1988 petitioner had transferred $15,096,879 of the proceeds from the sale of Northwest's ticket stock into brokerage accounts of which Northwest then had knowledge (contested accounts), he had transferred $4,102,049 from the contested accounts into various other accounts, he had withdrawn

$2,355,319 which Northwest's audit could not trace, and only $8,639,511 could be attributable to losses in the stock market. Northwest's auditors never were able to determine what petitioner had done with the $2,355,319 cash withdrawn from the contested accounts. Shortly after conclusion of the audit, on or about September 2, 1988, Northwest reiterated to petitioner that he and his corporations could no longer sell Northwest's tickets.

Disbursements From ANB Accounts During Northwest Litigation

During the pendency of the Northwest litigation (June 20, 1988, through its settlement on December 31, 1990), Northwest did not receive any amount from the ANB accounts. Northwest asked petitioner and Belofsky to release the funds in the ANB accounts to it during 1988, but petitioner refused because he wanted to keep control over the funds for purposes of negotiating a settlement.

In August 1989, with Northwest's permission, Belofsky used $7,313 of the funds in ANB No. 3 to redeem petitioner's personal residence from sale for back taxes. Petitioner did not report the $7,313 as income on his 1989 return.

Settlement of the Northwest Litigation

Petitioner and Northwest agreed to settle the Northwest litigation and executed an agreement to that effect (settlement agreement) on December 31, 1990. In the settlement agreement,

petitioner and petitioner's corporations, among other things, agreed to pay Northwest $865,000 from ANB account Nos. 2, 3, 4, and 5,[24] with any remaining balance to become the property of petitioner and his corporations. Pursuant thereto, Northwest received $865,000 from ANB Nos. 2 and 5, and the remaining balance of $5,674 in those two accounts was paid to petitioner and his corporations. The entire balance in ANB No. 3 ($94,722 including accrued interest) and in ANB No. 4[25] ($43,147 including accrued interest) became the property of petitioner and his corporations. Northwest also acknowledged in the settlement agreement that Belofsky held the ANB accounts solely as a custodian pursuant to the terms of the TRO. The settlement agreement further provided that the entire balance in the Sam Han account (then approximately $192,000) would be assigned by petitioner and his corporations to Northwest, as well as any amounts remaining in Chung Nos. 1, 2, 3, and 4.[26] The record does

---

[24] As of Jan. 2, 1991, ANB No. 5 contained funds that had been transferred to it from ANB No. 6 in February 1989. At the time of the transfer to ABN No. 5, ANB No. 6 contained funds that had been transferred to it from ANB No. 1. Additionally, on May 1, 1989, $500 had been transferred from ANB No. 6 to ANB No. 5.

[25] As noted previously, the corporate funds that were transferred to ANB No. 4 form no part of the $986,856 that respondent contends is includible in petitioner's income in 1988.

[26] The source and disposition of funds in 1991 pursuant to the settlement agreement were:

(continued...)

not show what amount, if any, Northwest received from Chung Nos. 1, 2, and 4.  The settlement agreement did not address the P-B No. 2 account.

Subsequent to the execution of the settlement agreement, petitioner paid Belofsky $14,800 from ANB No. 3 and $31,400 from ANB No. 4 for his services.

---

[26](...continued)

| Source | Amount from source | Interest earned 1988-91 | Amount and disposition to Pet./Pet. Corp. | Northwest |
|---|---|---|---|---|
| Chung#1 to Chung#3 to P-B#2 to ANB#2 | $271,836 | $54,930 | $3,749 | $323,017 |
| FCIS to P-B#1 to ANB#1 to ANB#6 to ANB#5 | 445,596 | 98,312 | 1,925 | 541,983 |
| Albank #1 & Albank #3 & Mayfair Bank to Sam Han | 137,128 | N/A | -0- | 196,441 |
| Chung #3 | N/A | N/A | -0- | 4,502 |
| Albank#1 & Albank#3 & Mayfair Bank to Sam Han to ANB#3 | 80,000 | 14,722 | 94,722 | -0- |
| Allied to ANB#4 | 35,852 | 7,295 | 43,147 | -0- |

Corporate Returns and Other Corporate Information

For 1987, IL NA Tours filed a Form 1120, U.S. Corporation Income Tax Return, which did not indicate that it constituted a consolidated tax return. The 1987 return reported gross receipts of $34,146,381 and a net loss after net operating loss deduction of $287,241. The Schedule L, Balance Sheets, reflected total assets of $10,159,061, accounts payable of $16,875,904, capital losses of $6,472,649, and no stockholder equity as of yearend 1987.

For 1988, IL NA Tours filed a Form 1120 which did not indicate that it constituted a consolidated tax return. IL NA Tours' 1988 return reported gross receipts of $9,272,913 and a net loss of $2,211,399 before any net operating loss deduction. As of yearend 1988, Schedule L reflected total assets of $9,578,469, accounts payable of $18,597,355, capital losses of $6,472,649, other liabilities of $100,967, and capital stock of $10,000 (common stock). The 1988 return does not reflect any loans to or from shareholders at the beginning or close of the year. The return also does not reflect any purchases or sales of stock, nor any income from interest or dividends. For 1988, IL NA Tours did not have any current earnings and profits nor any accumulated earnings and profits.

IL NA Tours did not file any Federal income tax returns after its 1988 return.

Air America filed returns for 1988 and 1989, but not for the years 1990 through 1995.

Neither Air America's nor IL NA Tours' returns for 1987 or 1988 reported any transactions related to the brokerage accounts under individual names to which Northwest had traced corporate funds. Regarding those brokerage accounts, for 1987 petitioner reported on his return selected transactions relating only to his FCIS account, his Allied account, and various other brokerage accounts not at issue in this case. For 1988, petitioner reported only selected sales of stock in his FCIS account, his Allied account, and P-B No. 1 on his return.

Dividend Income Issue

During 1988, the following amounts of dividend income were paid on stocks held in the accounts noted: $3,525 in Chung No. 1 (on March 1), $211 in Chung No. 3, $4,500 in the FCIS account (on April 4, 1988), $16,905 in the Sam Han account, and $8,412 in P-B No. 2 (during March 1988).

Petitioner reported no dividend income on his 1988 return.

Interest Income Issue

On January 30, 1989, Belofsky forwarded Forms 1099, Interest Income, to Chung which reported that ANB Nos. 1 through 4 had

earned interest income during 1988 totaling $27,992. Petitioner reported the $27,992 in interest as income on his 1988 return. The $27,992 interest income remained in the ANB accounts during 1988. Petitioner obtained backup withholding credits in 1989, 1990, and 1991 with respect to the ANB accounts.

Depreciation and Rental Income Issues

During 1988, petitioner, through a land trust, owned real property at 5528 N. Lincoln Avenue, Chicago, Illinois (Lincoln Avenue I property) and at 5524-5526 N. Lincoln Avenue (Lincoln Avenue II property) (collectively, the Lincoln Avenue properties). Petitioner was the sole owner of the Lincoln Avenue properties.

During 1987 and 1988, the offices of Air America and IL NA Tours were located on the first and second floors, respectively, of the Lincoln Avenue I property. After 1988, Air America occupied the entire Lincoln Avenue I property. On its 1987 return, IL NA Tours claimed a deduction of $37,810 for rent expense in the "Other deductions" category of expenses. Air America did not deduct rent expense on its 1987 return other than a deduction for equipment rent. On their 1988 returns, Air America reported rent expense of $12,425 in the "Other deductions" (line 26) category of expenses, and IL NA Tours reported rent expense of $41,127 in the "Other deductions"

category of expenses as well as in the "Rents" (line 16) category.

During 1987, petitioner received rental income. He deposited checks received from rentals in an account at Albank. On Schedule E, Supplemental Income Schedule, of his 1987 return, petitioner reported $16,800 in rents received, $23,080 of expenses other than depreciation, depreciation of $11,875, and a net loss of $18,155 related to the Lincoln Avenue II property. He did not report any rents or expenses related to the Lincoln Avenue I property on that return.

On Schedule E of his 1988 return, petitioner reported rents received of $10,430, other expenses other than depreciation of $19,410, depreciation of $10,744, and a net loss of $19,724 related to the Lincoln Avenue II property; he reported no rental activity related to the Lincoln Avenue I property.

During the audit of petitioner's 1988 return, petitioner told the revenue agent conducting the audit that the $41,127 deducted by IL NA Tours and the $12,425 deducted by Air America for rents, in total $53,552, constituted rents they had paid him for use of space in the Lincoln Avenue I property. The revenue agent included $43,123 of unreported rental income relating to the Lincoln Avenue I property in petitioner's income for purposes of determining the deficiency for 1988. The revenue agent

derived the $43,123 unreported rental income by subtracting (erroneously) from the $53,552 rental income relating to the Lincoln Avenue I property the $10,430 that petitioner had received and reported in income relating to the Lincoln Avenue II property. During trial preparation, petitioner reiterated to respondent's counsel that during 1988 Air America and IL NA Tours had paid him $53,552 for use of the Lincoln Avenue I property.

Petitioner's 1988 Return

Petitioner did not review his 1988 return before he signed it. On that return, petitioner deducted $2,450 for real estate taxes on Schedule A, Itemized Deductions, that were paid by his corporations. He also deducted $3,991 of unreimbursed employee expenses even though his corporations paid his employee expenses. In addition, petitioner deducted $4,271 of investment interest on Schedule A of the return to which he concedes he is not entitled. On Schedule E of the return, petitioner deducted $19,410 for expenses other than depreciation related to the Lincoln Avenue II property. Respondent disallowed this deduction for lack of substantiation, and petitioner now concedes that he is not entitled to it.

OPINION

Diverted Corporate Funds Issue

In early 1988, petitioner transferred $1,294,058 from an account of one of his corporations (Albank No. 1) into a personal brokerage account, the FCIS account, to purchase stock held in that account. Before the end of February 1988, all but two blocks of the stock purchased (i.e., the Pan Am and Kodak stock) had been sold, and the proceeds transferred from petitioner's FCIS account back to his corporation's Albank No. 1 account. The stock so liquidated was generally sold at a profit. As a result, with respect to the $1,294,058 taken from the corporate account, petitioner was able both to return $752,702 to the corporation and to retain in his FCIS account stock purchased with $565,478 in corporate funds (i.e., $116,600 for the Pan Am stock plus $448,878 for the Kodak stock).

On March 4, 1988, petitioner transferred the Kodak stock from his FCIS account to another personal account, P-B No. 1. On March 17, 1988, petitioner transferred the Kodak stock from P-B No. 1 to the Sam Han account (which he controlled). He transferred the Kodak stock back to P-B No. 1 on June 20, 1988. On June 24, 1988, petitioner sold the Kodak stock for a net of

$445,598[27] and transferred the proceeds to ANB No. 1, a custodial account governed by the TRO.  In January 1991, pursuant to the settlement agreement, Northwest received $541,983 and petitioner and his corporations received $1,925 from ANB No. 5 (which had been funded with money transferred from ANB No. 1 through ANB No. 6).  See supra note 26.

On April 11, 1988, petitioner transferred the Pan Am stock to another personal brokerage account, P-B No. 2, which contained the proceeds of the Gerber stock (diverted from a corporate account in 1987) as well as other assets of petitioner's.  The Pan Am stock was then sold on April 22 and May 20, 1988, for a net of $104,143.[28]  On May 26, 1988, petitioner transferred $271,836 in cash from P-B No. 2 to ANB No. 2, a custodial account governed by the TRO.  In January 1991, pursuant to the settlement agreement in the Northwest litigation, Northwest received $323,017 and petitioner and his corporations received $3,749 from ANB No. 2.  See supra note 26.

With respect to the transfers between the corporate Albank No. 1 account and petitioner's FCIS account, respondent determined that the "net" amount taken from and not returned to

---

[27] Petitioner reported the loss from the sale of the Kodak stock on his individual return; IL NA Tours did not report it.

[28] The loss on the sale of the Pan Am stock was not reported by petitioner or by IL NA Tours on their respective returns.

the corporate account by yearend constituted taxable income to petitioner; that is, respondent determined that the $1,294,058 transferred from the corporate account to purchase stock in the personal brokerage account, less $757,202[29] in stock sales proceeds returned to the corporate account, or $536,856, was additional income to petitioner in 1988.  Respondent proposed no adjustment to petitioner's taxable income as a result of the profitable (or losing) sales of the stocks for which the proceeds were returned to Albank No. 1.[30]  Thus, respondent's determination of additional income as a result of the transfers between the corporate Albank No. 1 account and petitioner's personal FCIS account equaled $536,856, even though stocks purchased with corporate funds totaling $565,478 were retained in petitioner's FCIS account as the net result of the transfers.

In addition, during the first 3 months of 1988, petitioner transferred a total of $450,000 in cash from corporate accounts into the Sam Han account.  On July 18, 1988, a check for $80,000

---

[29] For this purpose, respondent treated the stock proceeds returned to the corporate account ($752,702), as well as a $4,500 dividend paid on the Kodak stock on Apr. 4, 1988, and transferred from petitioner's FCIS account to the corporate Albank No. 1 account on the same day, as amounts returned.

[30] Petitioner in any event reported the gains and losses from the sale of all but one of these stocks on his 1988 return (although he now contends that he held the stocks as an agent of his corporations).

drawn on the Sam Han account was deposited into ANB No. 3, a custodial account governed by the TRO. On October 14, 1988, the TRO was amended specifically to cover the Sam Han account. The account contained assets of $137,128 at yearend 1988. Pursuant to the settlement agreement, (i) in January 1991, petitioner and his corporations received $94,722 and Northwest received nothing from ANB No. 3, and (ii) on April 1, 1991, Northwest received the balance remaining in the Sam Han account, which at that time was $196,441. See supra note 26.

The $450,000 that petitioner transferred to the Sam Han account from corporate accounts, together with the "net" of $536,856 in funds taken from and not returned to the corporate Albank No. 1 account by yearend, make up the $986,856 that respondent asserts in an amendment to his answer was diverted by petitioner from his corporations in 1988.

Respondent contends that the entire $986,856 is ordinary income which must be included in petitioner's income for 1988. In the alternative, respondent contends that the $986,856 should be deemed a distribution from IL NA Tours in excess of petitioner's basis in the stock which must be included in his income for 1988. The unreported income issue constitutes new matter resulting in an increased deficiency. Respondent has the burden of proving any new matter or increased deficiency. Rule

142(a); Truesdell v. Commissioner, 89 T.C. 1280, 1296 (1987).
Petitioner bears the burden of proof with respect to the
determinations made in the notice of deficiency.[31]  Rule 142(a).

Generally, unless otherwise provided, gross income under
section 61 includes net accessions to wealth from whatever source
derived.  Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431
(1955).  A gain

> constitutes taxable income when its recipient has such
> control over it that, as a practical matter, he derives
> readily realizable economic value from it.  That occurs
> when cash * * * is delivered by its owner to the
> taxpayer in a manner which allows the recipient freedom
> to dispose of it at will, even though it may have been
> obtained by fraud and his freedom to use it may be
> assailable by someone with a better title to it.
> [Rutkin v. United States, 343 U.S. 130, 137 (1952);
> citations omitted.]

See also United States v. Rochelle, 384 F.2d 748, 751 (5th Cir.
1967); McSpadden v. Commissioner, 50 T.C. 478, 490 (1968).
The economic benefit accruing to the taxpayer is the controlling
factor in determining whether a gain is income.  Rutkin v. United
States, supra; United States v. Rochelle, supra.

Under the "claim of right" doctrine, it is well settled that
unlawful, as well as lawful, gains are included within the

---

[31] Sec. 7491 does not apply to this case because the
examination commenced before July 22, 1998, the effective date of
that section.  See Internal Revenue Service Restructuring and
Reform Act of 1998, Pub. L. 105-206, sec. 3001(c)(1), 112 Stat.
727.

definition of gross income.  James v. United States, 366 U.S. 213 (1961) (money obtained from embezzlement); Rutkin v. United States, supra (money obtained by extortion); Leaf v. Commissioner, 33 T.C. 1093 (1960) (money diverted from wholly owned insolvent corporation to defraud corporation's creditors), affd. per curiam 295 F.2d 503 (6th Cir. 1961).  Generally, a taxpayer who unlawfully and fraudulently obtains funds is liable for taxes on the full amount of the funds if the taxpayer receives the money without the consensual recognition of an obligation to repay and there is no restriction on the disposition of the money.  James v. United States, supra at 219; Mais v. Commissioner, 51 T.C. 494, 498-499 (1968); Leaf v. Commissioner, supra at 1096.  The mere possibility that demands may eventually be made for refunds or that the taxpayer has an obligation to make requested refunds in a later taxable year does not relieve the taxpayer of tax on the diverted funds.  James v. United States, supra; United States v. Rosenthal, 470 F.2d 837, 842 (2d Cir. 1972); Leaf v. Commissioner, supra; see also Stovall v. Commissioner, 762 F.2d 891 (11th Cir. 1985), affg. T.C. Memo. 1983-450; Quinn v. Commissioner, 524 F.2d 617, 625 (7th Cir. 1975), affg. 62 T.C. 223 (1974).  However, where repayment is effected during the same taxable year as the taking, the taxpayer is not taxed on the amounts repaid.  Mais v. Commissioner, supra;

Leaf v. Commissioner, supra; Stovall v. Commissioner, T.C. Memo. 1983-450.

Funds distributed by a corporation to its shareholders with respect to their stock over which the shareholders have dominion and control generally are taxed under the provisions of section 301(c).  Where a shareholder diverts corporate funds or uses corporate property for his personal benefit, not proximately related to corporate business, the shareholder must include the value of the benefit in income as a constructive dividend.  E.g., Truesdell v. Commissioner, supra at 1294-1295; Falsetti v. Commissioner, 85 T.C. 332, 356 (1985).  However, "'Not every corporate expenditure incidentally conferring economic benefit on a shareholder is a constructive dividend.'"  Loftin & Woodard, Inc. v. United States, 577 F.2d 1206, 1215 (5th Cir. 1978) (quoting Crosby v. United States, 496 F.2d 1384, 1388 (5th Cir. 1974)); Hood v. Commissioner, 115 T.C. 172, 179-180 (2000).  The determinative factor is whether the distribution was primarily for the shareholder's benefit, in which case it is taxable to the shareholder as a constructive dividend, or primarily for the corporation's benefit, in which case it is not a constructive dividend.  Crosby v. United States, supra at 1389; Hood v. Commissioner, supra at 180.

Additionally, in general, "a taxpayer need not treat as income moneys which he did not receive under a claim of right, which were not his to keep, and which he was required to transmit to someone else as a mere conduit." Diamond v. Commissioner, 56 T.C. 530, 541 (1971), affd. 492 F.2d 286 (7th Cir. 1974). Thus, money a taxpayer receives in his or her capacity as a fiduciary or agent does not constitute taxable income to that taxpayer, Herman v. Commissioner, 84 T.C. 120, 134-136 (1985); Heminway v. Commissioner, 44 T.C. 96, 101 (1965), and a shareholder who takes personal control of corporate funds is not taxable on them so long as it is shown that he held the funds as an agent of the corporation and/or deployed them for a corporate purpose, AJF Transp. Consultants, Inc. v. Commissioner, T.C. Memo. 1999-16, affd. without published opinion 213 F.3d 625 (2d Cir. 2000); St. Augustine Trawlers, Inc. v. Commissioner, T.C. Memo. 1992-148, affd. sub nom. O'Neal v. Commissioner, 20 F.3d 1174 (11th Cir. 1994); Alisa v. Commissioner, T.C. Memo. 1976-255.

In the instant case, petitioner admits that he transferred corporate funds totaling $986,856 into his personal accounts during early 1988. Respondent contends that petitioner diverted the $986,856 and hid it in brokerage accounts he controlled because he intended to defraud Northwest of the moneys petitioner's corporations owed it. Respondent maintains that

petitioner increased his net wealth by $986,856 when he reduced that amount to his personal dominion and control.  Therefore, respondent asserts, petitioner's income should be increased by $986,856 for 1988.

Petitioner contends, however, that the $986,856 is not taxable to him because he did not withdraw those funds from the corporate accounts for his own benefit; rather, he placed them into his personal accounts in his capacity as an agent for IL NA Tours and for its benefit to protect the funds from seizure by Northwest.  Petitioner maintains that he did not use the $986,856 for personal purposes, but that he used the funds to benefit IL NA Tours, including transferring funds from his personal accounts to the ANB accounts which were used first to negotiate a settlement with Northwest in order for IL NA Tours to remain in business and then to pay corporate debts owed Northwest.

Petitioner relies on Stone v. Commissioner, 865 F.2d 342, 343 (D.C. Cir. 1989), revg. and remanding Rosenbaum v. Commissioner, T.C. Memo. 1983-113, in support of his agency theory.  In Stone, the Commissioner determined that the taxpayers, a corporate officer (who also was a shareholder in the corporation) and the corporation's attorney (who also served as one of its directors), had to include in income $4 million of corporate funds which had been derived from a series of

transactions designed to defraud the U.S. Government and which had been placed in secret Swiss bank accounts over which the taxpayers exercised control.  The Court of Appeals concluded that the funds need not be included in income.  The Court of Appeals stated

> even when a corporate officer is its sole shareholder (and thus in ultimate control), and he transfers corporate funds to his personal checking account, and his dealings with the corporation are "extremely informal," there is no constructive dividend so long as he can show that his intent "was to use such funds for corporate purposes as an agent of the corporation." * * *  [Id. (quoting Nasser v. United States, 257 F. Supp. 443, 449 (N.D. Cal. 1966)).]

Petitioner contends that the following facts demonstrate that he was acting on behalf of his corporations as an agent, to benefit the corporations, when he withdrew corporate funds and placed them into personal accounts:  (1) He returned funds to IL NA Tours to facilitate IL NA Tours' meeting its obligations to remit $62,155 per month to Northwest; (2) except for a nominal amount, he did not use the funds for personal purposes but instead invested them for corporate purposes; i.e., in an effort to save his corporations by earning money with which to repay Northwest; (3) he made personal guaranties of the corporate debt;[32] (4) he transferred funds to the ANB accounts, the control

_____

[32] Petitioner also argues in this connection that he mortgaged personal assets in order to obtain letters of credit
(continued...)

over which he gave to Belofsky and the transfers to which were made within 1988, so by yearend 1988 petitioner had ceded control back to IL NA Tours; (5) Belofsky used the funds in the ANB accounts to settle the lawsuit with Northwest which related to debts IL NA Tours owed Northwest; and (6) Chung recorded the ANB accounts as assets of IL NA Tours on the June 30, 1988, balance sheet and on IL NA Tours' 1988 corporate return.

Respondent disputes petitioner's claim that he had a corporate purpose for depositing the $986,856 into his personal brokerage accounts. Respondent contends that petitioner diverted the funds, and shuffled them through a maze of accounts, to defraud Northwest so that he could keep the funds for himself.

Whether petitioner was acting as an agent of his corporation is a question of fact. See Pittman v. Commissioner, 100 F.3d 1308, 1314 (7th Cir. 1996) (question of fact whether shareholder's diversion of corporate funds constitutes constructive dividend), affg. T.C. Memo. 1995-243. We look to petitioner's testimony and the objective facts to ascertain petitioner's intent. See, e.g., Busch v. Commissioner, 728 F.2d 945, 948 (7th Cir. 1984) (objective factors used to determine intent), affg. T.C. Memo. 1983-98; Spheeris v. Commissioner, 284

_____

[32](...continued)
that were subsequently exercised by Northwest to satisfy obligations of his corporations.

F.2d 928, 931 (7th Cir. 1960) (legal relationship between closely held corporation and its shareholders as to payments to the latter "must be established by a consideration of all relevant factors indicating the true intent of the parties."), affg. T.C. Memo. 1959-225; Kaplan v. Commissioner, 43 T.C. 580, 595 (1965).

We note at the outset that petitioner was not a credible witness. We found his testimony implausible and unconvincing. It was at times vague, evasive, self-serving, and contradictory. He had selective recall relating to the 1987 and 1988 transactions and the assets in issue in the instant case. We are not required to accept self-serving testimony, particularly where it is implausible and there is no persuasive corroborating evidence. E.g., Frierdich v. Commissioner, 925 F.2d 180, 185 (7th Cir. 1991) ("The statements of an interested party as to his own intentions are not necessarily conclusive, even when they are uncontradicted."), affg. T.C. Memo. 1989-103 as amended by T.C. Memo. 1989-393; Lerch v. Commissioner, 877 F.2d 624, 631-632 (7th Cir. 1989), affg. T.C. Memo. 1987-295; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). Additionally, a taxpayer's testimony as to intent is not determinative, particularly where it is contradicted by the objective evidence. Busch v. Commissioner, supra at 948; Glimco v. Commissioner, 397 F.2d 537, 540-541 (7th

Cir. 1968) (taxpayer's uncontradicted testimony need not be accepted), affg. T.C. Memo. 1967-119.

The objective evidence in the record contradicts petitioner's contention that he was acting as an agent in furtherance of a corporate purpose. Petitioner points first to the fact that between January and February 1988, he returned significant sums to IL NA Tours; that is, of the $1,294,058 that he initially transferred from an IL NA Tours' corporate account to his personal FCIS account, $752,702 was returned to IL NA Tours before the end of February.[33] It is true that this return of funds to the corporation (which occurred almost exclusively in February 1988) might support an inference that petitioner was holding them as the corporation's agent. If these were the only relevant facts, we might be persuaded. However, petitioner's other actions during 1988, discussed below, belie the claim of agency.

---

[33] Petitioner contends that the $752,702 returned to IL NA Tours was used to meet IL NA Tours' obligation under the January agreement to make payments of $62,155 per week to Northwest. The evidence in the record does not support this contention. In any event, for purposes of petitioner's argument that the return of funds to IL NA Tours indicates agency, it is sufficient that the funds were in fact returned to the corporation, which is undisputed.

Petitioner's next argument is that he did not, except for nominal amounts, use the funds at issue for personal purposes.[34] Instead, according to petitioner, he invested the funds in the stock market in an effort to produce sufficient earnings so that Northwest could be repaid and, petitioner further claims, all of the funds transferred from corporate accounts to personal accounts were eventually either transferred to the ANB accounts or frozen by the TRO and used ultimately to negotiate a settlement of IL NA Tours' debt to Northwest.

Petitioner's argument misstates the facts established by the record. Contrary to petitioner's argument, a significant portion of the $986,856 at issue in this case has <u>not</u> been accounted for. The record establishes that from late January through early March 1988, a total of $450,000 was transferred from the accounts of petitioner's corporations to the Sam Han account. The record further demonstrates that on July 18, 1988, $80,000 from the Sam Han account was deposited into ANB No. 3 and that at yearend 1988 the balance in the Sam Han account was $137,128. The record does not reflect what happened to the remainder ($232,872), and petitioner has made no effort to address this discrepancy.

---

[34] We treat this argument as referring to petitioner's actions prior to the issuance of the TRO. Once the TRO was issued, petitioner was under a court order proscribing his personal use of the funds. See <u>supra</u> p. 29.

Because petitioner's argument relies on the premise that all of the funds transferred from corporate accounts were accounted for, it must fail.

Petitioner next argues that his making a personal guaranty of his corporations' debts to Northwest (as requested by Northwest in March 1988) is inconsistent with respondent's theory that he transferred corporate funds to personal accounts for his own benefit, and not as an agent of the corporation. As petitioner observes on brief: "What would be the point in putting corporate money in a personal account and then subjecting the personal account to the corporate debt?" A close examination of the record in this case provides an answer to petitioner's rhetorical question; namely, by the time petitioner signed the Guaranty on March 18, 1988, he had succeeded in transferring the bulk of the funds at issue into an account in his brother's name; i.e., the Sam Han account. Of the $986,856 at issue, $450,000 was in the Sam Han account, $300,000 of which was moved there from corporate accounts in early 1988. An additional $150,000 that had been earlier moved from corporate accounts to accounts in petitioner's own name was moved on March 8 and 9, 1988, to the Sam Han account. Then, on March 17, 1 day before he signed the Guaranty, the Kodak stock--which had been purchased with $488,877 of the remaining funds at issue--was transferred from

petitioner's personal account to the Sam Han account.  Thus, when petitioner signed the Guaranty on March 18, he had already taken steps to place all of the assets at issue except the Pan Am stock in accounts that did not bear his name, thereby raising practical barriers to enforcement of the Guaranty against the bulk of the transferred corporate funds.  The very close proximity of the Kodak stock transfer and the execution of the Guaranty creates a strong inference that petitioner made the transfer in anticipation of signing the Guaranty.  Viewed in that light, the Guaranty appears to be a ruse designed to mislead Northwest with respect to petitioner's good faith.[35]

Moreover, any conclusion regarding agency that petitioner would have us infer from the Guaranty is substantially undermined by the fact that petitioner almost immediately repudiated it. Upon learning of the Guaranty a few days after it was signed,

---

[35] The fact that petitioner left the Pan Am stock in a personal account after signing the Guaranty is consistent with a pattern we discern in his other conduct; namely, making it possible for Northwest to recover relatively small amounts of the ticket sales proceeds, in an effort to convince Northwest that he was cooperating in good faith.  This pattern first surfaced at the beginning of 1988, when petitioner executed the January agreement acknowledging his corporations' indebtedness exceeding $3 million (when he knew the figure was substantially higher) and promising to retire the debt by yearend 1988 through weekly payments of approximately $62,000.  These weekly payments were in fact made until mid-March, by which time Northwest had figured out that petitioner's defalcations were much greater than $3 million.

petitioner's attorney disavowed it as entered into without benefit of counsel or adequate consideration. Petitioner's attorney argued that the Guaranty was void and repeatedly sought its return until the time that Northwest filed suit. Petitioner's position throughout the Northwest litigation was that his corporations, but not he personally, owed Northwest for whatever ticket sales proceeds were missing.

Petitioner next points to the transfer of certain of the funds at issue to the ANB accounts between May and July 1988 as evidence of his agency.

Petitioner first points to the transfer of $271,836 to ANB No. 2, which occurred in May 1988 before Northwest filed suit. Contrary to petitioner's position, we believe that careful scrutiny of that transfer shows that it was made to further petitioner's personal interests, to the detriment of the interests of his corporations. The record in this case demonstrates that the May 26, 1988, transfer of $271,836 referred to by petitioner was from P-B No. 2, a personal account of petitioner's, the contents of which are traceable both to the Gerber stock transferred in 1987 from a corporate to a personal account[36] and to the proceeds of the Pan Am stock that had been

---

[36] The Gerber stock had originally been transferred from a corporate account to Chung No. 1, a personal account of

(continued...)

purchased with corporate funds in January 1988 and initially placed in petitioner's FCIS account.[37]  The May 1988 transfer to the ANB No. 2 trust account was effected in connection with a proposal made to Northwest by Belofsky under which petitioner would be released from all liability under the Guaranty and the Interim Agreement in exchange for, inter alia, the payover to Northwest of the proceeds in the "Gerber account".  Belofsky sent a letter to Northwest on May 20, 1988, proposing the foregoing terms and advising Northwest that "I am directing Mr. Han to deposit with me the proceeds of the 'Gerber' account to be held by me until appropriate documentation is furnished in accordance with this letter".  On May 26, 1988, $271,836 was transferred from P-B No. 2 to ANB No. 2, which had been established by Belofsky as a client trust account.

Northwest rejected Belofsky's offer.  Nonetheless, from the standpoint of ascertaining whether petitioner was acting as an agent to serve a corporate purpose, we believe his actions with

---

(...continued)
petitioner's, in October 1987, then sold in December 1987.  The Gerber proceeds remained in Chung No. 1 until all contents of that account were transferred to Chung No. 3 during February 1988.  On Mar. 8, 1988, $321,351 was transferred from Chung No. 3 to P-B No. 2.

[37] As previously noted, the Pan Am stock was transferred from the FCIS account to P-B No. 2 on Apr. 11, 1988, and liquidated before the May 26, 1988, transfer of $271,836 from P-B No. 2 to ANB No. 2.

respect to the $271,836 transferred in an effort to consummate his lawyer's proposal are significant.

In transferring the $271,836 to ANB No. 2, petitioner was attempting to secure release from any personal liability to Northwest for the more than $8 million he had acknowledged his corporations owed the airline company. Under the Guaranty, petitioner (without benefit of counsel) had guaranteed all past and future monetary obligations of his corporations that arose out of ticket sales. In the Interim Agreement, entered into with the benefit of counsel, petitioner (i) confined his personal guaranty to debts arising from the receipt and sale of tickets received from Northwest in 1988 (but not before); and (ii) acknowledged on behalf of his corporations that with respect to pre-1988 ticket sales, his corporations had retained sales proceeds due and owing to Northwest in an amount exceeding $8 million. Had petitioner been successful in securing his release from all personal liability under the foregoing agreements, the result would have been to saddle his corporations with the sole liability for debts exceeding $8 million. The consideration petitioner proposed to use to secure his release consisted of $271,836 from a personal account into which corporate funds had been diverted. Obviously, this attempt would have "primarily benefitted" petitioner, see Loftin & Woodard, Inc. v. United

States, 577 F.2d at 1215, and been quite detrimental to petitioner's corporations, which would have lost a guarantor on acknowledged debts exceeding $8 million. Petitioner's contention that the transfer of the $271,836 to ANB No. 2 in May 1988 (before Northwest filed suit) indicates that he was acting on behalf of his corporations is untenable. Instead, this transfer demonstrates that petitioner was exercising personal dominion and control over the funds.

Petitioner also argues an agency theory with respect to the remaining transfers of funds to the ANB accounts, all of which occurred after Northwest filed suit. Specifically, petitioner contends that his intent to act as an agent is shown because he "funded the Belofsky trust accounts". Petitioner argues that he "willingly" relinquished control over the disputed funds to Belofsky to be held by him in the ANB accounts as trustee, and that once in the ANB accounts the funds were used in an effort "to make a deal to keep IL NA Tours in business". The argument concludes: "Petitioner used these funds as an agent of IL NA Tours to keep it in business. When that was no longer possible, he used these funds to settle its debts."

Petitioner's argument is an attempt to make a virtue out of a necessity. Aside from the ANB No. 2 transfer in May, petitioner did not "willingly" transfer anything to the remaining

ANB accounts. Those transfers were made to comply with the TRO that Northwest had obtained against petitioner, which mandated that petitioner produce information on the whereabouts of ticket sales proceeds and that those proceeds be transferred into accounts over which Northwest and/or the court exercised control. Indeed, the record in this case amply demonstrates that the court's granting of a TRO against petitioner was insufficient to cause him to identify all ticket sale assets and transfer them to trust accounts. Although an initial $445,596 was transferred to ANB No. 1 on June 24, 1988, 1 day after the granting of the TRO, the correspondence between petitioner's and Northwest's attorneys shows that the struggle to force petitioner to provide information regarding assets continued for several months thereafter. On July 1, Northwest's attorney wrote petitioner's attorney (i) advising that the "sparse" documentation provided by petitioner had enabled Northwest to unearth six additional accounts; (ii) complaining of petitioner's "pattern" of withholding financial and account information to which Northwest claimed entitlement under the TRO; and (iii) threatening to seek court supervision if petitioner's pattern continued. The remaining transfers to the ANB accounts (Nos. 3 and 4) occurred

after this correspondence.[38]  The transfers made to the ANB accounts after Northwest obtained the TRO do not reflect petitioner's agency; they were involuntary.

Petitioner's claim that he used the funds at issue on behalf of IL NA Tours, i.e., "to keep it in business", is contradicted by the objective evidence in the record.  As late as April 1988, Northwest remained willing to do business with petitioner and his corporations, providing them with substantial ticket stock for resale pursuant to the terms of the Interim Agreement, notwithstanding that they had acknowledged selling Northwest's tickets and failing to remit proceeds in an amount exceeding $8 million.  (Presumably, Northwest made the business calculation that its chances of ever seeing its money were better if petitioner's corporations were allowed to continue operations.)  However, what Northwest perceived as petitioner's unrelenting efforts to hide the missing funds from Northwest's auditors--that is, his refusal to cooperate in providing the information he had agreed to provide in the Interim Agreement, even when both sides acknowledged that ticket proceeds exceeding $8 million had not been remitted--ultimately prompted Northwest to file suit and

---

[38] An additional $137,128 of the funds that the record establishes were taken from the IL NA Tours' account and placed in the Sam Han account was not revealed and made subject to the TRO until Oct. 14, 1988.

obtain a TRO that prohibited petitioner and his corporations from dealing any further in Northwest tickets. The record amply demonstrates that between the execution of the Interim Agreement in early April and Northwest's filing suit in mid-June, it became obvious to Northwest that petitioner was hiding assets and would not cooperate in providing any restitution of amounts that he acknowledged were owed by his corporations. The record is equally clear that it was petitioner's actions that caused the change in Northwest's attitude, from reluctant creditor willing to provide additional ticket stock to legal adversary determined to prohibit petitioner and his corporations from any further dealings in Northwest tickets.[39] Belofsky conceded in his testimony in this case that the sale of Northwest tickets constituted 90 percent of petitioner's corporations' business activity at the time.

On this record, we do not accept petitioner's contention that his actions with respect to the funds at issue were for the primary benefit of his corporations rather than himself. It is clear that petitioner's actions <u>harmed</u> his corporations,

---

[39] In this regard, we look to petitioner's actions both in the months leading up to Northwest's filing suit and after the filing and granting of the TRO, when petitioner's conduct caused Northwest to threaten to seek sanctions on several occasions and, in our view, hardened Northwest's animosity towards petitioner.

effectively forfeiting their ability to do business with
Northwest.  We also conclude that it was reasonably foreseeable
by petitioner that his actions would have this result; we do not
believe petitioner could have thought otherwise, in view of his
conduct and the response it engendered in Northwest in the months
leading up to and following the filing of Northwest's lawsuit.
We are satisfied from the record that petitioner's intentions by
mid-1988 were to keep for himself whatever ticket proceeds he
could hide from Northwest's auditors.  With the exception of ANB
No. 2, the funds in the ANB accounts subject to the TRO were
transferred there <u>despite</u> petitioner's best efforts.  Although
petitioner tried to thwart Northwest's discovery of the ticket
proceeds, by not cooperating in disclosing financial information
despite his obligation to do so under the Interim Agreement and
then the TRO, Northwest's auditors were able to trace and
identify the funds, thereby forcing petitioner to transfer them
to custodial accounts.

Because of petitioner's efforts to keep the funds hidden, we
find petitioner's remaining evidence of agency, namely, that
Chung recorded the funds in the ANB accounts as assets of IL NA
Tours in workpapers for the corporation's June 30, 1988,
financial statement and on its 1988 return, unpersuasive.  To the
extent these funds were so recorded, those compilations occurred

after Northwest had succeeded in tracing the funds and forcing them into custodial accounts governed by the TRO. Thus, these recordations--the earliest of which occurred in August 1988--are not probative regarding whether petitioner was holding the funds as an agent before his actions were mandated by the TRO.[40]

Petitioner's vigorous efforts to keep the funds that he had taken from corporate accounts hidden from Northwest, even when these actions harmed his corporations, also persuade us that petitioner exercised personal dominion and control over those funds in 1988. In one instance, petitioner may have voluntarily disclosed diverted corporate funds to Northwest; namely, when the $271,836 identified by petitioner's attorney as the proceeds of the "Gerber account" was transferred from P-B No. 2 to ANB No. 2 on May 26, 1988, in connection with petitioner's attorney's proposal to secure petitioner's release from liability under the Guaranty and Interim Agreement.[41] However, in line with our

---

[40] Respondent objected at trial to the admission of the workpapers on grounds of authenticity, hearsay, and completeness. We reserved ruling on those objections. In a separate order, we have overruled respondent's objections and admitted the workpapers as evidence. However, in our view, the workpapers are not probative regarding petitioner's intentions or agency, and we do not rely on them in reaching our findings.

[41] Whether petitioner voluntary disclosed to Northwest his purchase of the Gerber stock with his corporations' funds or Northwest's auditors instead traced the transaction is not clear from the record. In view of the record as a whole, however, the latter is much more likely.

earlier analysis of this transaction, we conclude that petitioner exercised personal dominion and control over the ANB No. 2 funds when he sought to employ them to secure his release from any personal liability with respect to his corporations' obligations to Northwest.  Thus, by mid-1988 petitioner had exercised personal dominion and control over all of the corporate funds that he had transferred to personal accounts in early 1988.

Although we conclude petitioner had exercised dominion and control over the funds at issue by mid-1988, the question remains whether the taxability of the funds to petitioner is affected by the fact that some of the funds were returned to custodial accounts or otherwise made subject to the TRO before yearend 1988.  Funds over which a taxpayer has obtained dominion and control, lawfully or unlawfully, are not taxable to him to the extent they are repaid before yearend.  Mais v. Commissioner, 51 T.C. 494 (1968); Leaf v. Commissioner, 33 T.C. 1093 (1960); Stovall v. Commissioner, T.C. Memo. 1983-450; see also Hammer v. Commissioner, T.C. Memo. 1989-396 (amounts returned by shareholder to corporation in subsequent year not taxable where shareholder derives no benefit); Rev. Rul. 65-254, 1965-2 C.B. 50 (deduction allowable under section 165 with respect to embezzled funds in the year of repayment).  In Leaf v. Commissioner, supra at 1096, we held that a controlling shareholder who takes funds

from his corporation when it is insolvent is taxable on the portion of the funds that he keeps for his own purposes but not on the portion that is returned to the corporation or its creditors before yearend.  A difficult issue in this case is whether the transfer of funds into accounts subject to the TRO constitutes a repayment to the corporation within the meaning of the foregoing authorities.

Respondent's position is that it does not.  Respondent argues that petitioner maintained dominion and control over the funds after their transfer into the ANB accounts.  Respondent cites several factors:  The ANB accounts were maintained in petitioner's name and Social Security number with petitioner's attorney as trustee; petitioner reported the interest earned on ANB account funds in 1988 on his return and received backup withholding credits in certain years; disbursements were made from the ANB accounts to pay personal expenses of petitioner; petitioner refused Northwest's repeated requests that funds in the ANB accounts be released to Northwest in payment of his corporations' acknowledged indebtedness; the ANB accounts were used as security for petitioner's attorney's fees and were used to negotiate and settle petitioner's personal liability to Northwest.

We do not agree that petitioner maintained dominion and control over the funds that were placed in accounts subject to the TRO. We note first that the relevant inquiry here is petitioner's dominion and control vis-a-vis his corporations, not in relation to Northwest. Respondent at times appears to suggest the contrary, as when he argues that petitioner's refusal to turn the funds in the ANB accounts over to Northwest indicates petitioner's exercise of dominion and control. But in refusing to release the ANB account funds to Northwest, petitioner could have been acting equally on behalf of his corporations and of himself, since both were defendants in Northwest's complaint, and the funds subject to the TRO were being held, in effect, to secure whatever claims Northwest might have against petitioner <u>or</u> his corporations.

We also do not find persuasive of petitioner's dominion and control such factors as the ANB accounts' being established under petitioner's name and Social Security number, petitioner's initially reporting the interest earned in the accounts on his own 1988 return, or petitioner's being given backup withholding credits with respect to the accounts. Relying on petitioner's nominal ownership would elevate form over substance. Similarly, the position a taxpayer takes on his return is relevant, but far from dispositive. Respondent's suggestion that <u>petitioner's</u>

attorney served as custodian for the accounts overlooks the fact that Belofsky at all times served as counsel for both petitioner and his corporations.  The one disbursement for petitioner's personal expenses from an ANB account--to pay delinquent taxes on petitioner's residence--was made with Northwest's permission.[42]

Respondent's contention that funds in the ANB accounts served as security for petitioner's attorney's fees finds little support in the record.  Pursuant to the settlement of the Northwest litigation, petitioner and his corporations in 1991 received all amounts remaining in the ANB accounts after payment to Northwest of $865,000.  The payment to Northwest was satisfied with funds from ANB Nos. 2 and 5 (a successor to ANB No. 1), with the remaining balance of $5,674 in those accounts going to petitioner and his corporations.  Petitioner accordingly received the entire contents of ANB Nos. 3 and 4, totaling $137,869. Belofsky was subsequently paid a total of $14,800 from ANB No. 3 and $31,400 from ANB No. 4.[43]  Moreover, as noted, Belofsky served as counsel to both petitioner and his corporations; thus payment of his fees to some extent served a corporate purpose.

---

[42] Moreover, this expenditure arguably served Northwest's interests as a creditor, by preserving assets available to satisfy a judgment.

[43] The funds in ANB No. 4 are not at issue in this case.

Of singular importance, we disagree with respondent's contention that the funds in the ANB accounts were used to satisfy petitioner's personal liability to Northwest.  We do not believe that respondent, who has the burden of proof, has shown by a preponderance of the evidence that the ANB funds were used to satisfy petitioner's, as opposed to his corporations', liabilities to the airline.  Northwest's complaint was filed, and the TRO obtained, against petitioner <u>and</u> his corporations. Northwest at all times pursued its complaint against the foregoing defendants[44] and likewise entered the settlement agreement with both petitioner <u>and</u> his corporations.  The corporations, not petitioner, had operated as consolidators for Northwest; i.e., Northwest's ticket stock had been provided to and sold by the corporations.  Thus, petitioner's corporations were primarily liable to Northwest for the ticket stock or the proceeds from its sale.  In our view, this is why Northwest, in addition to filing suit against both petitioner and his corporations, also had sought petitioner's personal guaranty of his corporations' indebtedness to Northwest, refused to surrender the Guaranty, and based one count of the complaint on it.

---

[44] Default judgments were entered against NY NA Tours, CA NA Tours, and SF NA Tours, but petitioner's other corporations remained defendants until settlement.

Starting almost immediately after its execution, petitioner vigorously challenged the validity of the Guaranty.

Respondent also attempts to demonstrate that the funds in the ANB accounts were used to satisfy petitioner's personal liabilities, and therefore remained under his personal dominion and control, by emphasizing that Northwest had asserted claims of fraudulent conversion and unjust enrichment against petitioner personally. Since Northwest had asserted claims against petitioner personally, respondent's argument goes, use of the funds in the custodial accounts to settle the Northwest litigation satisfied petitioner's personal liabilities. Respondent in effect attempts to negate any significance of the transfer of the funds to custodial control by arguing that petitioner incurred personal liability by virtue of taking funds from his corporation that were owed to the corporation's creditor, so that when the funds were paid over to the creditor, the liabilities extinguished were those of petitioner rather than the corporation. In the circumstances of this case, we think the argument is specious. Any controlling shareholder who takes funds from his corporation when it is insolvent will likely have exposure to a claim of fraudulent conversion, unjust enrichment, or similar charges from the corporation's creditors. If, as respondent argues, this factor means that the return of funds to

the corporation or its creditors satisfies the shareholder's liability and therefore serves a shareholder rather than a corporate purpose, we think the exception provided in Leaf v. Commissioner, 33 T.C. 1093 (1960), for wrongfully appropriated funds that are returned within the same year would be nullified. Mr. Leaf received a criminal conviction for taking funds from his insolvent corporation, but he was not taxable on the amounts returned in the year of the taking. Respondent's argument regarding the satisfaction of petitioner's personal liabilities to Northwest is inconsistent with the holding in Leaf, and we accordingly reject it.

On this record, respondent has not shown that the funds in the ANB accounts were held in 1988, or ultimately used in 1991, to satisfy petitioner's, as opposed to his corporations', obligations to Northwest.

As a consequence, we find that the deposit of funds into accounts subject to the TRO represented a deployment of the funds for corporate purposes. The ANB accounts and the Sam Han account were subject to the TRO. As a result, no transfer or other disposition of the funds in the accounts could be made without Northwest's or the court's authorization. The TRO was granted upon a showing that Northwest had a substantial likelihood of prevailing in its claim that the accounts contained proceeds from

the sale of Northwest's ticket stock that were owed to Northwest. We find that in 1988 the accounts in effect served to secure Northwest's rights against petitioner and his corporations, and in 1991 a substantial portion of the accounts was in fact paid in settlement of Northwest's claims asserted against petitioner and his corporations. Consequently, by yearend 1988 the funds in the ANB accounts and the Sam Han account were being held under court supervision to satisfy liabilities that were as much petitioner's corporations' as petitioner's.

In these circumstances, we conclude that the funds in the ANB accounts and the Sam Han account by yearend 1988 had been repaid or returned to petitioner's corporations in that year and accordingly are not taxable to petitioner under Leaf and like cases applying the exception to the claim of right doctrine. We base our conclusion that these funds had been returned to the corporations for purposes of this exception on several factors. First, petitioner no longer had dominion and control over the funds once they were subject to the TRO. Although respondent argues that petitioner's attorney's role as custodian of the ANB accounts demonstrates petitioner's maintenance of dominion and control, the facts do not support this characterization. The disbursements for petitioner's personal expenses were made only with Northwest's approval. Further, Northwest's attorney

testified in this proceeding that petitioner's attorney's actions with respect to the ANB accounts were at all times consistent with his custodial function.

Second, the cases that have considered the exception for the repayment of taken funds within the same taxable year have countenanced a range of circumstances as constituting repayment or return. In Leaf v. Commissioner, supra, the sole shareholder-taxpayer had taken funds from his insolvent corporation. After the corporation's creditors filed an involuntary bankruptcy petition against it and within the same year as the taking, the taxpayer "repaid to * * * [the corporation] or its creditors" a portion of the funds. Id. at 1095. We held the shareholder was taxable only on the funds "not returned to the corporation or its creditors" in the year of the taking. Id. at 1096; see also Mais v. Commissioner, 51 T.C. 494, 499 (1968) (dicta) (portion of embezzled funds turned over in year of embezzlement to third party to be held for victim not taxable); Stovall v. Commissioner, T.C. Memo. 1983-450 (shareholder's diversions from corporation not taxable to extent used in year of diversion to purchase certificates of deposit in corporation's name). We are mindful that the Court of Appeals for the Seventh Circuit, to which an appeal in this case would ordinarily lie, has for purposes of the same-year repayment exception distinguished

between actual repayment and the giving of a promissory note, holding the latter insufficient to prevent wrongfully taken funds from being taxed to the taker. Quinn v. Commissioner, 524 F.2d 617 (7th Cir. 1975), affg. 62 T.C. 223 (1974). Nonetheless, we are satisfied that petitioner's transfer of funds to the ANB accounts and the subjection of the Sam Han account to the TRO constitute repayments for purposes of the exception. These amounts were "returned to the corporation or its creditors" because petitioner lost control of the funds to a third-party custodian who held them as security for a creditor's claim against his corporations.

We now apply our findings concerning petitioner's exercise of dominion and control by mid-1988 over, and his return before yearend of a portion of, the funds at issue in this case.

The $986,856 at issue is best understood as comprising (1) the $536,856 "net" proceeds petitioner retained after the multiple transfers in early 1988 between the corporate Albank No. 1 account and his personal FCIS account, and (2) the $450,000 in cash transferred from corporate accounts to the Sam Han account.

The $536,856 "net" proceeds are traceable to the Kodak stock and the Pan Am stock, purchased with $448,878 and $116,600 of corporate funds, respectively.[45]

_____

[45] The total amount used to purchase these two blocks of

(continued...)

In accordance with our earlier analysis, petitioner exercised dominion and control over the Kodak stock before returning the proceeds from its sale to his corporations (by virtue of the transfer of those proceeds to the ANB No. 1 account on June 24, 1988). Specifically, after being moved from petitioner's FCIS account to the P-B No. 1 account, to the Sam Han account and back to P-B No. 1, the Kodak stock was sold on June 24, 1988, for a net of $445,598, which was transferred that same day to ANB No. 1. Since petitioner purchased the Kodak stock with diverted corporate funds of $448,878 and returned only $445,598 to his corporations, he is chargeable with $3,280 in income as a result ($448,878 - $445,598 = $3,280).[46]

_____

(...continued)
stock exceeds respondent's determination because petitioner sold the other stocks purchased with corporate funds at a profit and returned the augmented proceeds to a corporate account. Because of this augmentation of the returned proceeds, respondent's computation of the "net" proceeds retained by petitioner–– measured by the amount taken less the amount returned––is less than the actual corporate funds retained by petitioner and invested in the Kodak and Pan Am stock. See discussion supra pp. 45-46.

[46] As noted earlier, petitioner reported the loss from the sale of Kodak stock on his 1988 return. Since the diminution in the stock's value occurred while it was under petitioner's dominion and control, and he is chargeable with the income resulting from his return to his corporations of Kodak stock proceeds that were less than the corporate funds used to acquire the stock, we conclude that petitioner is entitled to the loss as claimed.

Similarly, with respect to the Pan Am stock, because we have concluded that petitioner by mid-1988 had exercised personal dominion and control over the assets diverted from his corporations (and was not holding them as a mere agent of his corporations), petitioner exercised dominion and control over the Pan Am stock. However, the evidence adduced by respondent shows that, unlike the Kodak stock, neither the Pan Am stock nor its proceeds were returned to petitioner's corporations before yearend 1988. The Pan Am stock remained in the FCIS account from its purchase on January 22, 1988, until April 11, 1988, when petitioner transferred it to another personal account, P-B No. 2. P-B No. 2 already contained substantial assets, including the proceeds from the Gerber stock, with a net value of $273,855 on March 31, 1988, just prior to its receipt of the Pan Am stock. (The Gerber stock had been liquidated on December 24, 1987, for $335,563, and the contents of the account containing the Gerber stock proceeds, then totaling $321,351, had been transferred to P-B No. 2 on March 9, 1988.) On May 26, 1988, petitioner transferred $271,836 in cash from P-B No. 2 to ANB No. 2, a custodial account that Belofsky had set up in connection with his proposal to secure petitioner's release from any personal liability to Northwest. Belofsky represented to Northwest that ANB No. 2 was being funded with the "'Gerber' account" proceeds.

Because the P-B No. 2 account had been the recipient of the Gerber stock proceeds, the Pan Am stock proceeds, and other assets of petitioner's before petitioner transferred $271,836 in cash from the account to fund ANB No. 2, the question arises whether the amount so transferred is traceable to the Gerber stock, the Pan Am stock, or some other asset of petitioner's.

Petitioner was actively buying and selling securities through the P-B No. 2 account in March through May 1988, as well as making personal charges against the proceeds in the account by means of a credit card. The Gerber and Pan Am stock proceeds were commingled with other personal funds of petitioner's and were used to offset losses in other stocks in the account that had been purchased on margin. The statements for P-B No. 2 in the record do not show a clear source of the funds for the $271,836 transfer to ANB No. 2. However, because petitioner's attorney represented to Northwest that the $271,836 transfer to ANB No. 2 was the proceeds of the "Gerber account", we treat this as an admission by petitioner that the amount transferred was from that source and no other. Consequently, we find that no portion of the Pan Am stock proceeds was transferred to ANB No. 2. Instead, the record in this case establishes that the Pan Am stock was transferred from petitioner's FCIS account to petitioner's P-B No. 2 account on April 11, 1988, sold in two

blocks on April 22 and May 20, 1988, for a net total of $104,143, and commingled with other personal funds of petitioner's. Since the record establishes that petitioner used $116,600 in corporate funds to purchase the Pan Am stock and that the Pan Am stock and its proceeds are traceable to a personal account of petitioner's, respondent has met his burden of showing that petitioner had unreported income of $116,600 in 1988 as a result of the Pan Am stock transactions.[47]

With respect to the $450,000 in cash that petitioner transferred in early 1988 from corporate accounts to the Sam Han account, petitioner's exercise of personal dominion and control over all transferred assets by mid-1988 renders the cash in the Sam Han account taxable to him except to the extent that the record shows that amounts in the Sam Han account were transferred to custodial accounts or otherwise made subject to the TRO. The record establishes that $80,000 was transferred on July 18, 1988, from the Sam Han account to ANB No. 3, a custodial account subject to the TRO. In addition, Northwest's auditors discovered the Sam Han account in August or early September 1988, and the TRO was amended specifically to cover it on October 14, 1988. Respondent has shown that $450,000 in cash from corporate

---

[47] Since petitioner sold the Pan Am stock for $104,143 in 1988, he may be entitled to a loss on its disposition. We anticipate that the parties will address this matter in their Rule 155 computations.

accounts was transferred into the Sam Han account in 1988, that $80,000 was transferred to a custodial account, and that $137,128 in assets remained in the Sam Han account after it was discovered and made subject to the TRO in late 1988, leaving $232,872 in cash that petitioner took from his corporations unaccounted for.

Respondent has also shown petitioner's habit of spending corporate funds for personal items; for example, respondent has shown that in 1987 petitioner caused corporate funds of $52,000 to be paid to gambling casinos, $16,000 to be paid on the mortgage loan on his personal residence, and $51,068 to be paid into accounts in the names of women who were not employees of petitioner's corporations,[48] and in 1988 that petitioner diverted to personal purposes additional corporate funds of $85,688 (that are not included in the unreported income pled by respondent in his answer).

Consequently, we find that respondent has shown that petitioner dissipated for personal purposes or otherwise exercised dominion and control over the $232,872 in cash transferred to the Sam Han account that is not otherwise accounted for. Accordingly, we conclude that petitioner has

---

[48] In this regard, it is also significant that the diversions we note for 1987 occurred before the stock market crash; that is, they occurred before the exigencies of the losses from the stock market crash and Northwest's ticket recall program that petitioner contends caused him to divert corporate assets in order to "hide" them from Northwest.

unreported income in that amount as a result of diversions from his corporations.

The amounts we conclude petitioner diverted from his corporations to personal use in 1988 are:

| Description | Amount |
| --- | --- |
| Kodak stock proceeds | $3,280 |
| Pan Am stock proceeds | 116,600 |
| Sam Han account | 232,872 |
| Total | 352,752 |

The question remains whether the amounts we have concluded are unreported income of petitioner are taxable as ordinary income under section 61(a) or as constructive dividends under section 301(c). Respondent, relying principally on Leaf v. Commissioner, 33 T.C. at 1095, contends that the amounts are taxable under section 61(a) because they were wrongfully appropriated in a fraud upon a third party dealing with the corporation. Petitioner, citing our opinion in Truesdell v. Commissioner, 89 T.C. 1280 (1987), contends that section 301(c) governs the taxation of any amounts that we conclude were transferred from IL NA Tours to him. For the reasons outlined below, we agree with petitioner.

In Leaf, we held that amounts that had been taken by a shareholder from his wholly owned corporation for his own use (and not returned within the year of the taking) at a time when

the corporation was insolvent were taxable to the shareholder under the predecessor of section 61(a).[49]  The taxpayer had not argued, and we did not consider, whether these amounts were constructive dividends taxable under section 301(c).  In a more recent case, Truesdell v. Commissioner, supra, the Commissioner likewise argued that a shareholder who diverted funds from his wholly owned corporation was taxable under section 61(a).  The taxpayer argued that the amounts were constructive dividends, taxable pursuant to the terms of section 301(c).  We agreed with the taxpayer, stating:

> As a general proposition, where a taxpayer has dominion and control over diverted funds, they are includable in his gross income under section 61(a), unless some other modifying Code section applies.  The latter is the situation here, since Congress has provided that funds (or other property) distributed by a corporation to its shareholders over which the shareholders have dominion and control are to be taxed under the provisions of section 301(c).  [Id. at 1298; citation omitted.]

We distinguished Leaf on the grounds that the taxpayer therein had fraudulently transferred funds that should have been available to creditors, in contemplation of bankruptcy.  By contrast, the diverted funds in Truesdell had not been wrongfully appropriated from other shareholders or in fraud of creditors.  "We need not and do not express an opinion on the need to apply a constructive dividend analysis in a situation where the

---

[49] Sec. 22(a), I.R.C. 1939.

shareholder utilized the corporation to steal from, embezzle from, or otherwise defraud other stockholders or third parties dealing with the corporation or shareholder." Id. at 1297; see also United States v. Peters, 153 F.3d 445 (7th Cir. 1998) (citing Truesdell with approval).

Respondent contends that the instant case should be governed by Leaf rather than Truesdell because petitioner took the funds at issue to defraud a third party (Northwest) dealing with the corporation. We disagree. The unreported income issue is new matter which respondent raised by amendment to answer to the amended petition. Therefore, respondent has the burden of proof on this issue. Rule 142(a). Respondent has not shown by a preponderance of the evidence that the funds taken by petitioner belonged to Northwest as opposed to IL NA Tours or one of the other corporations of which petitioner was the sole shareholder. Northwest issued the ticket stock to petitioner's corporations at a large discount. Money for the ticket stock was due after the tickets were sold. The corporations were entitled to substantial commissions for the sold tickets. There is no evidence that IL NA Tours, or any of petitioner's other corporations, segregated the funds due Northwest or that the consolidator agreement required them to do so. In addition, the NA Tours companies served as consolidators for Korean Air Lines, and Air America and

IL NA Tours operated as retail travel agents, for which services additional compensation could be earned. Thus, at any time, the funds commingled in corporate accounts could include IL NA Tours' profit share from ticket sales and commissions earned, in addition to any funds petitioner's corporations owed Northwest and any other airline companies for which they sold tickets.

The fact that Northwest was not entitled to all the funds at issue finds further support in the fact that pursuant to the settlement of the Northwest litigation in 1990, Northwest agreed that petitioner and his corporations would receive $143,543 of the corporate funds (plus accrued interest) that Northwest alleged, and petitioner concedes in the instant case, were taken by him and placed in personal accounts. The record does not disclose why Northwest agreed that petitioner and his corporations would receive some of the disputed funds. What the record does establish is that petitioner's corporations, unlike the corporation in Leaf, were not adjudicated bankrupt; instead, the creditor in the instant case compromised its claim for something less than all the debtors' assets.

We accordingly conclude that respondent has failed to show that the facts in the instant case bring it under the rule in Leaf. Our conclusion that the amounts petitioner took from his corporations should be taxed pursuant to section 301(c) finds

further support in the fact that the record strongly suggests, and respondent has certainly failed to show otherwise, that the amounts in issue were previously subject to tax at the corporate level. IL NA Tours reported gross receipts exceeding $34 million on its 1987 return. Respondent concedes that the losses in excess of $6 million in the corporate investment accounts occasioned by the 1987 stock market crash were reported on that return. IL NA Tours reported gross receipts exceeding $9 million on its 1988 return, a dropoff that is consistent with the disruption in its sale of Northwest tickets in that year. These gross receipts figures suggest that the Northwest ticket sales that were the source of petitioner's diversions were reported at the corporate level.

In Truesdell, we quoted with approval the following observation of the Court of Appeals for the Eighth Circuit: "We believe that the only way that the diverted income already taxed to the corporation can be taxed to the individual taxpayers is by the treatment of such diversions as dividends and corporate distributions." Truesdell v. Commissioner, 89 T.C. at 1299 (quoting Simon v. Commissioner, 248 F.2d 869, 876-877 (8th Cir. 1957)). Because the record strongly suggests that the amounts petitioner diverted from his corporations were subject to tax at the corporate level, we are quite reluctant to find them taxable

to him pursuant to section 61(a); in the absence of better proof by respondent, we decline to do so and hold that the taxation of the amounts at issue is governed by section 301(c).

Under section 301, the distribution is treated as a dividend if it meets the requirements of section 316. Under section 316(a), dividends are taxable to the shareholder as ordinary income to the extent of the earnings and profits of the corporation, and any amount received by the shareholder in excess of earnings and profits is considered a nontaxable return of capital to the extent of the shareholder's basis in his stock. Any amount received in excess of both the earnings and profits of the corporation and the shareholder's basis in his stock is treated as gain from the sale or exchange of property.

Respondent concedes that IL NA Tours had no current or accumulated earnings and profits. Petitioner had no basis in his IL NA Tours stock.[50] Accordingly, the $352,752 that we have

---

[50] IL NA Tours' 1988 return lists capital stock on its balance sheet of $10,000, although petitioner testified that he only lent money to his corporations. Even if petitioner contributed $10,000 to IL NA Tours, we are satisfied that petitioner had no basis in his IL NA Tours' stock. We have found that petitioner took an additional $85,688 from IL NA Tours during 1988 that was not included in the amount that respondent has pled as unreported income, and petitioner reported salary income of only $37,500 on his 1988 return. Thus there were diversions from IL NA Tours in 1988 that exceeded any possible basis petitioner had in the stock of the corporation.

found petitioner diverted from his corporations in 1988 is to be treated as a gain from the sale or exchange of property.

Dividend Income Issue

In the notice of deficiency, respondent determined that petitioner had unreported income for 1988 of $12,912[51] relating to dividend income credited to his FCIS account and to P-B No. 2. Petitioner has the burden of proving that he did not underreport his income relating to those accounts. Rule 142(a). Respondent contends that petitioner did not offer any credible evidence regarding this issue.

By amendment to his answer, respondent additionally asserted that petitioner had unreported income for 1988 of $20,641 relating to dividends credited during 1988 to the Sam Han, Chung No. 1, and Chung No. 2 accounts. The parties agree that those three accounts received dividend income totaling $20,641 during 1988. Respondent has the burden of proving the increased deficiency relating to the $20,641 dividend income. Rule 142(a). As previously noted, the Sam Han, Chung No. 1, and Chung No. 2 accounts were owned and controlled by petitioner.

Petitioner contends that none of the $33,554 in dividends in the original determination or the amended pleadings is taxable

---

[51] The parties have stipulated that the dividends paid on stocks in the FCIS and P-B No. 2 accounts totaled $12,912.

to him because he held the funds in his FCIS account, P-B No. 2, the Sam Han account, Chung No. 1, and Chung No. 2 as an agent of IL NA Tours.  Thus, petitioner contends, the funds belonged to IL NA Tours, and it should have reported the dividend income for 1988 on its own return.  Respondent contends, however, that petitioner must include the $33,554 in his income for 1988 because the principal in the foregoing brokerage accounts was under his sole dominion and control when the dividends were earned, and therefore such dividends were income to him under the "fruit of the tree" doctrine in Lucas v. Earl, 281 U.S. 111 (1930).

We have concluded and held herein that petitioner exercised dominion and control over the funds diverted in 1988 and is taxable on them except to the extent the funds were returned to custodial accounts within the 1988 taxable year.  With respect to respondent's original determination concerning the $12,912 in dividends in the FCIS and P-B No. 2 accounts, we hold that petitioner has failed to show error in the determination and accordingly sustain it.  The $4,500 dividend on the Kodak stock in the FCIS account was paid on April 4, 1988, when petitioner had dominion and control over the FCIS account and before the Kodak stock proceeds were transferred to a custodial account on

June 24, 1988.[52] The $8,412 in dividends recorded in the P-B No. 2 account was paid during March 1988, before any amounts in that account were transferred to a custodial account. Moreover, there is no evidence that any portion of this dividend income was paid over to a custodial account.

We turn to the remaining dividend income for which respondent bears the burden of proof. Stocks in the Sam Han account earned dividends totaling $16,905 throughout 1988. Although petitioner had dominion and control over the account at least until Northwest's auditors discovered it in early September 1988 (which resulted in the TRO's being amended to specifically cover it), a substantial portion of the contents of the account was made subject to custodial control before yearend 1988; specifically, $80,000 was transferred from the Sam Han account to ANB No. 3 on July 18, 1988, and the remaining contents in the Sam Han account at yearend 1988, after it had been made subject to the TRO, equaled $137,128. In these circumstances, we conclude that respondent has failed to show that the dividends earned in the Sam Han account were not transferred to custodial control before yearend 1988. We accordingly hold that petitioner is not

_____

[52] Although petitioner transferred $4,500 from his FCIS account to IL NA Tours' Albank No. 1 account on the same day the FCIS account received the $4,500 dividend, respondent effectively reduced his deficiency assertion by that amount when he treated this $4,500 as a return of funds to IL NA Tours.

taxable on the $16,905 in dividends earned in the Sam Han account.

The balance of the dividend income for which respondent bears the burden was earned in Chung No. 1 ($3,525 on March 1, 1988) and Chung No. 3 ($211). Respondent has shown that petitioner had dominion and control over Chung No. 1 when the dividends were earned. Further, respondent has shown that the transfers out of Chung No. 1 into Chung No. 3, which are traceable to ANB No. 2, occurred before the dividends at issue were paid. Accordingly, respondent has shown that the dividends in Chung No. 1 were not transferred to ANB No. 2 or any other custodial control. Therefore, we sustain respondent's averment that petitioner has unreported dividend income of $3,525 in connection with his control of Chung No. 1. With respect to Chung No. 3, the record does not disclose when the $211 in dividends (paid on a money market fund) in that account was paid. Moreover, because there were transfers from Chung No. 3 to P-B No. 2 to ANB No. 2, and the money market dividends could reasonably be described as "Gerber account" proceeds (in accordance with petitioner's characterization of those transferred amounts that we have elsewhere treated as an admission), we conclude that respondent has failed to show that the dividends paid in the Chung No. 3 account were not

transferred to custodial control before yearend 1988. We therefore hold that petitioner does not have unreported dividend income of $211 in connection with his control of the Chung No. 3 account.

Petitioner contends further, however, for the first time on brief that respondent failed to give him the benefit of all of the incidents of ownership of the brokerage accounts asserted to be under his dominion and control. According to petitioner, these brokerage accounts in large part purchased stocks on margin; and they incurred margin interest costs of $67,193, which was deducted directly from the brokerage accounts and for which respondent did not give petitioner credit. Petitioner additionally alleges that the brokerage accounts incurred capital losses of $15,764 for which respondent did not give petitioner credit. Petitioner contends that if he must include the dividends in his income, then he should also be allowed to claim the capital losses of $15,764 and margin interest deductions of $67,193. Respondent counters that petitioner's untimely claim of additional losses and deductions prejudices respondent because he is effectively precluded from attempting to show that petitioner had additional unreported gains from other personal brokerage accounts into which corporate funds were diverted but which were not included in the deficiencies asserted.

This Court generally will not consider issues that are raised for the first time on brief, particularly where the belated claim would prejudice a party. Rules 34(b)(4), 41(a) and (b); Foil v. Commissioner, 92 T.C. 376, 418 (1989), affd. 920 F.2d 1196 (5th Cir. 1990); Markwardt v. Commissioner, 64 T.C. 989, 997 (1975); see also Toyota Town, Inc. v. Commissioner, T.C. Memo. 2000-40, affd. sub nom. Bob Wondries Motors, Inc. v. Commissioner, 268 F.3d 1156 (9th Cir. 2001). Leave to amend a pleading should be given, however, "when justice so requires". Rule 41(a).

We note first that we have concluded herein that petitioner is effectively not the owner of the dividends respondent attributed to him from the Sam Han and Chung No. 1 accounts. These two accounts contain $54,372 of the $67,193 in margin interest for which petitioner seeks an offset. Moreover, the evidence adduced by respondent in this case demonstrates that petitioner had additional unreported income of $85,688 in 1988 that respondent nonetheless did not use as a basis to amend his pleadings to assert an increased deficiency. In these circumstances, we conclude that respondent would be prejudiced if petitioner were permitted to raise for the first time on brief his entitlement to margin interest deductions and capital losses. Also, the belated income offsets to which petitioner might be

entitled fall short of the additional unreported income noted above. Consequently, the interests of justice do not require that petitioner be permitted to raise new issues on brief.

Interest Income Issue

On his 1988 return, petitioner included $27,992 of interest income attributable to the ANB accounts. The ANB accounts were opened and maintained throughout 1988 and beyond under petitioner's Social Security number. Petitioner obtained backup withholding tax credits in 1989, 1990, and 1991 for the ANB accounts. In an amendment to petition, petitioner alleged that the interest income should not be included in his income because the ANB accounts belonged to IL NA Tours, and therefore the corporation should have reported it.

Petitioner contends that the ANB accounts were reflected as assets on IL NA Tours' June 1988 financial statement and on its 1988 corporate return. Petitioner maintains that he had no power to control the ANB accounts after they were funded, he did not receive the interest, and the funds in the ANB accounts, including the interest earned on those funds, were not intended to benefit him. He further contends that money in the ANB accounts was used for IL NA Tours' benefit and, ultimately, to pay its debts. Petitioner asserts that his accountant erroneously included the interest on petitioner's return.

Respondent contends, however, that petitioner properly reported the interest income on his return because it was earned on funds he had taken from his corporations and converted to his own dominion and control.

In line with our earlier holding that the transfer of funds to the ANB accounts before yearend 1988 constitutes a return of those funds to petitioner's corporations, it follows that the interest earned on the funds in the ANB accounts in 1988 is not taxable to petitioner.  We so hold.

Depreciation Issue

On his 1988 return, petitioner reported rental income of $10,430 and deducted rental expenses of $19,410 in addition to depreciation of $10,744[53] relating to the Lincoln Avenue II property.  Respondent determined that petitioner was not entitled to deduct the rental expenses or the depreciation.  Petitioner has conceded that he is not entitled to deduct the rental expenses.  Petitioner has the burden of proving that he is entitled to the depreciation deduction.  Rule 142(a).

Petitioner contends that he is entitled to a depreciation deduction of $9,963 relating to the Lincoln Avenue II property. He maintains that he bought the property during 1984 for either $150,000 or $160,000 and that he financed the purchase with a

---

[53] The parties have stipulated that the appropriate depreciation, if any is allowable, is $9,963.

mortgage in his name which he paid.  Petitioner asserts that respondent did not cross-examine him on his testimony nor offer any evidence that petitioner did not pay for the property in 1984.

Respondent contends that petitioner has failed to establish the cost of the property or that he used his own funds to acquire it.  Accordingly, respondent contends, petitioner has failed to prove his basis in the property or his entitlement to the depreciation claimed.

To show entitlement to a deduction for depreciation, petitioner must establish, among other things, the depreciable basis of the property.  See Delsanter v. Commissioner, 28 T.C. 845, 863 (1957), affd. in part, revd. and remanded on another issue 267 F.2d 39 (6th Cir. 1959).  The evidence in the record relating to basis in the Lincoln Avenue II property consists solely of petitioner's self-serving statements, which we reject because they are uncertain, ambiguous, and uncorroborated.  See Frierdich v. Commissioner, 925 F.2d at 185; Tokarski v. Commissioner, 87 T.C. at 77.  Accordingly, petitioner has not established basis and may not deduct depreciation with respect to the Lincoln Avenue II property in 1988.  We therefore sustain respondent's determination.

Rental Income Issue

During 1988, Air America and IL NA Tours occupied space on the first and second floors, respectively, of the Lincoln Avenue I property.  On their 1988 returns, Air America deducted $12,425 and IL NA Tours deducted $41,127 for rent in the "Other deductions" category on the returns.  In addition, IL NA Tours deducted $41,127 in the "Rent" category of its return.[54]

On his 1988 return, petitioner reported $10,430 in rental income relating to the Lincoln Avenue II property but did not report any rental income relating to the Lincoln Avenue I property.  During the examination of petitioner's 1988 return, petitioner told the revenue agent conducting the examination that the amounts deducted for rent by Air America ($12,425) and IL NA Tours ($41,127), in total $53,552, were for the use of space in the Lincoln Avenue I property.  In the notice of deficiency respondent determined that petitioner had unreported income of $43,123 relating to rental income attributable to the Lincoln Avenue I property.[55]

_____

[54] Respondent has not put in issue any additional income that might be associated with the duplicative $41,127 deduction.

[55] The revenue agent had erroneously subtracted the $10,430 rental income reported on petitioner's return relating to the Lincoln Avenue II property from the $53,552 in unreported rental income relating to the Lincoln Avenue I property.  Respondent has not amended the answer further to include the additional unreported rental income.

During trial preparation, petitioner reiterated to respondent's counsel that during 1988 Air America and IL NA Tours had paid him rent totaling $53,552 for their use of space in the Lincoln Avenue I property. Before trial commenced, however, petitioner retracted that statement and instead informed respondent's counsel that he had discovered he had not received rent for use of space in the Lincoln Avenue I property from his corporations. He claimed further that the rent deducted by IL NA Tours constituted rent the corporation had paid to various commercial rental agents on behalf of various subagents of IL NA Tours. In support of his statement, petitioner submitted to respondent's counsel a number of checks made payable to third parties with addresses in cities where certain NA Tours companies were located. Those companies were separately incorporated corporations wholly owned by petitioner. Petitioner bears the burden of proving that he did not receive the rental income in issue during 1988. Rule 142(a).

Petitioner contends that he did not receive rent from IL NA Tours or Air America during 1988. According to petitioner, he told the revenue agent that he "thought" the $53,552 in rent had been paid to him for the use of space in his Lincoln Avenue I property. He contends that he made the statement at a time when he did not have any records relating to the transactions.

Petitioner maintains that checks he gave respondent's counsel during trial preparation compared with cash disbursement spreadsheets included in certain workpapers in evidence show that the rent payments did not go to him but instead went to third-party commercial rental agents that rented space to branch offices of IL NA Tours.

Respondent contends that petitioner has not shown that IL NA Tours and Air America did not pay him rent during 1988. Respondent asserts that the evidence on which petitioner relies is not relevant to the issue of rental payments made by IL NA Tours and Air America to him because none of the checks or cash disbursement recordations relate to payments for space used by IL NA Tours or Air America.

Respondent asserts further that the checks petitioner submitted do not add up to the $53,552 in total that Air America and IL NA Tours deducted as rental expense on their corporate returns. Respondent contends that petitioner's pattern of taking money from his corporations belies his claim that he passed up an opportunity to take rental income from his corporations, especially when his activities were being carefully monitored by Northwest.

We are persuaded on the basis of the record that petitioner was in error when he informed the revenue agent and respondent's

counsel that IL NA Tours paid him $41,127 in rent for the use of space in his Lincoln Avenue I property.  We are persuaded that the $41,127 deducted on IL NA Tours' 1988 return consisted of rental payments for commercial office space in cities where IL NA Tours maintained branch offices.

The checks petitioner submitted for 1988 were drawn on bank accounts maintained by IL NA Tours, NY NA Tours, or CA NA Tours and total $41,672.28, which approximates the amount IL NA Tours deducted as rental expense.  Chung signed most of the checks.  He testified that the office rents reflected in the corporation's workpapers were payments for office space rented by branch offices maintained by IL NA Tours in various cities.  He also testified that it would have been his practice to obtain the numbers reflected in the workpapers from the listing of accounts payable.  As controller of IL NA Tours, Chung would be in a better position than petitioner to know the recipients of payments that IL NA Tours had deducted on its 1988 return.

Respondent's argument that the payments do not add up to the $53,552 in issue is misleading inasmuch as those checks relate to payments made by IL NA Tours, which deducted $41,127.  The balance of the $53,552 relates to the $12,425 deducted by Air America.  Petitioner did not submit any checks written on accounts maintained by Air America.

On the basis of Chung's corroborating testimony, we are persuaded that the rental expenses IL NA Tours claimed on its corporate return did not relate to payments made to petitioner. Thus, we hold that petitioner did not have unreported rental income of $41,127 from IL NA Tours in 1988.[56]

The rationale we apply to decide whether IL NA Tours paid petitioner $41,127 in rental income during 1988 does not apply, however, to the $12,425 deducted by Air America for rental expense in 1988. Other than petitioner's self-serving retraction of his statements to the revenue agent and respondent's counsel, there is no proof that petitioner did not receive the $12,425 he admitted receiving from Air America for use of space in the Lincoln Avenue I property. Petitioner's arguments relating to the cash disbursement spreadsheets and to the checks he submitted to respondent's counsel are not persuasive as to rental payments made by Air America since those spreadsheet notations and checks apply only to IL NA Tours. Presumably, Air America maintained its own books and records since it was a separate entity from IL NA Tours.

---

[56] The propriety of IL NA Tours' deduction of rental payments for the benefit of other corporations owned by petitioner is not before the Court and, therefore, we do not address the question of whether the payments to the third-party rental agents would have been a deductible expense of IL NA Tours.

Petitioner told both the revenue agent and respondent's counsel that Air America paid him rent for the use of space in the Lincoln Avenue I property. Air America maintained its office at property owned by petitioner and deducted $12,425 for rent expenses. The record contains no proof that Air America paid anyone other than petitioner for rent expenses. As far as the record reflects, Air America did not have branch offices. The NA Tours companies were separate entities from Air America.

We do not agree with petitioner that the corporate workpapers in evidence show that he did not receive rental income from Air America. Those documents were records of IL NA Tours, not Air America. Moreover, in arguing for the receipt into evidence of these workpapers, petitioner stressed that these documents did not constitute all of the books and records for IL NA Tours and were merely workpapers accumulated by Chung to assist him in the preparation of IL NA Tours' tax returns. Chung did not testify that those documents constituted all of the workpapers Chung gathered for that purpose. Furthermore, petitioner's counsel never asked Chung at trial whether Air America paid rental income to petitioner during 1988. The normal inference is that testimony on that matter would have been unfavorable to petitioner's position. See Frierdich v. Commissioner, 925 F.2d at 185; Tokarski v. Commissioner, 87 T.C.

at 77; Bresler v. Commissioner, 65 T.C. 182, 188 (1975); Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). We are not required to accept petitioner's self-serving testimony that his corporations did not pay him rent. Frierdich v. Commissioner, supra; Liddy v. Commissioner, 808 F.2d 312, 315 (4th Cir. 1986), affg. T.C. Memo. 1985-107; Laney v. Commissioner, 674 F.2d 342, 349-350 (5th Cir. 1982), affg. in part, revg. in part and remanding on another issue T.C. Memo. 1979-491.

On the basis of the foregoing, we hold that petitioner has not met the burden of proving that he did not have $12,425 in unreported rental income from Air America in 1988.

Addition to Tax for Negligence Issue

In the notice of deficiency, respondent determined that petitioner is liable for an addition to tax for negligence under section 6653(a)(1) for 1988. In the amendment to answer to amendment to petition, respondent alleged that petitioner was liable for the addition to tax for negligence for the issues raised in the amendment to answer.

Section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment if any part of the deficiency was due to negligence or intentional disregard of rules or regulations.

"Negligence" includes a failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code.  Sec. 6653(a)(3).  "Disregard" includes any careless, reckless, or intentional disregard of rules or regulations.  Id.; Crocker v. Commissioner, 92 T.C. 899, 916-918 (1989); Neely v. Commissioner, 85 T.C. 934, 947-950 (1985).  The negligence addition to tax will apply if, among other things, the taxpayer fails to maintain adequate books and records with regard to the items in question. Crocker v. Commissioner, supra.

In the stipulation of settled issues, petitioner has conceded that he understated income and overstated deductions relating to his 1988 return.  Petitioner has failed to prove that those items were not due to negligence.  Furthermore, petitioner has conceded that he would be liable for the addition to tax for negligence if we decide, as we have in part, that the funds he took from corporate accounts must be included in his income in 1988.  For 1988, the addition to tax for negligence applies to the entire deficiency if any part of the deficiency is due to negligence or intentional disregard of rules or regulations. Accordingly, we conclude that petitioner is liable for the addition to tax for negligence under section 6653(a) for the deficiencies determined in the notice of deficiency and the

increased deficiencies asserted in the amendment to answer to the amended petition to the extent sustained herein.

Addition to Tax for Substantial Understatement of Income Tax Issue

In the notice of deficiency, respondent determined that petitioner is liable for the addition to tax under section 6661 for 1988 because he substantially understated his income tax. In the amendment to answer to amendment to petition, respondent asserts that petitioner is liable for the addition to tax for substantial understatement of income for the issues raised in the amendment to answer. Petitioner has the burden of proof as to the issues raised in the notice of deficiency, and respondent has the burden of proof for the new matter and increased deficiency asserted in the amendment to answer. Rule 142(a).

Section 6661(a) imposes an addition to tax equal to 25 percent of the underpayment attributable to an understatement where there is a substantial understatement of income tax. An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown or $5,000. Sec. 6661(b)(1)(A). An "understatement" is defined as the excess of the tax required to be shown on the return over the tax actually shown on the return. The amount of the understatement is reduced for section 6661 purposes by the portion of the understatement which is attributable to the taxpayer's treatment of an item if

there is substantial authority for that treatment, or if relevant facts affecting the item's tax treatment are adequately disclosed in the return.  Sec. 6661(b)(2)(B).

Petitioner contends merely that the addition to tax for substantial understatement of tax is computational and will not apply if we accept his arguments relating to the issues involved in the instant case.  Thus, petitioner provided no evidence that he had substantial authority for the understatement, and his tax return did not disclose the relevant facts sufficient to enable respondent to identify the potential controversy involved. Schirmer v. Commissioner, 89 T.C. 277, 285-286 (1987). Respondent presented evidence at trial through testimony of witnesses and documents and through the concessions at trial and in the briefs, sufficient to meet the burden of proving certain increased deficiencies raised in the amendment to answer to amendment to petition.  Accordingly, we sustain respondent as to the imposition of the addition to tax for substantial understatement of income tax.

To reflect the foregoing,

Decision will be entered

under Rule 155.